326 F.2d 264
 64-1 USTC P 9198
 Edward C. VICTORSON and Anne Victorson, Graham, Ross & Co.,
Inc., Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
COMMISSIONER OF INTERNAL REVENUE, Petitioner,
v.
Edward C. VICTORSON and Anne Victorson, Graham, Ross & Co.,
Inc., Respondents.
 Nos. 85, 86, Docket 28319, 28320.
 United States Court of Appeals Second Circuit.
 Argued Dec. 12, 1963.
Decided Jan. 15, 1964.
 
 Martin M. Lore, New York City, for taxpayers.
 Edward L. Rogers, Dept. of Justice, Washington, D.C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, and Melva M. Graney, Washington, D.C., on the brief), for Commissioner.
 Before CLARK,* SMITH and HAYS, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 Edward C. Victorson, Anne Victorson, and Graham, Ross & Company, Inc., seek review of decisions of the Tax Court of the United States upholding the Commissioner's determination that the taxpayers realized income when they exercised the right to purchase stock in Glamur Products, Inc., a right which they secured as partial compensation for their services in underwriting a public issue of Glamur Products stock. To safeguard the revenue the Commissioner filed protective petitions. As we reject the contentions presented by the taxpayers, we need not consider the Commissioner's petitions.
 
 
 2
 The taxable years in issue are, for the Victorsons, 1954, 1955 and 1956 and for Graham, Ross & Company, Inc., the fiscal years ended April 30, 1955, 1956 and 1957. During these years Graham, Ross was an over-the-counter house engaged in the stock brokerage and underwriting business, and Edward C. Victorson was its sole stockholder and principal executive officer. Anne Victorson is a party only because she filed joint returns with her husband.
 
 
 3
 On September 21, 1954, Graham, Ross entered into an underwriting agreement with Hosid Products Corporation (subsequently known as Glamur Products, Inc.) and with Hosid Products' president and principal shareholder, Jack Hosid, for the public issue of 600,000 shares of common stock at the public offering price of 50 cents per share. Under the agreement Graham, Ross was to receive (1) 12 1/2 cents per share until a total of $20,000 had been paid to cover the costs and expenses to Graham, Ross incident to the public offer, (2) a commission of 12 1/2 cents per share on all shares sold, and (3) the right, for every six shares sold to the public, to purchase one share at the price of one mill ($.001) per share. If the entire issue of 600,000 shares was sold, Victorson was to have the right to purchase 50,000 additional shares at one mill per share.
 
 
 4
 Graham, Ross first sold Glamur Products stock to the public on November 18, 1954, and the offering was successfully completed on February 1, 1955. On May 23, 1955, Graham, Ross and Victorson exercised their right to purchase 100,000 and 50,000 shares respectively of Glamur Products stock at the price of one mill ($.001) per share. 46,498 of the 100,000 shares acquired by Graham, Ross were transferred to its salesmen and other employees as a bonus for participation in the successful underwriting.
 
 
 5
 The compensatory nature of the right to purchase the shares is not disputed. The determinations of the Tax Court in respect to which petitioners claim error are:
 
 
 6
 Holding that the date upon which income was realized was May 23, 1955, the date that the taxpayers' right to purchase the stock was exercised, rather than February 1, 1955, the date the underwriting was completed and the taxpayers became finally entitled to purchase 150,000 shares of stock.
 
 
 7
 Holding that the Glamur Products stock purchased by the taxpayers had an ascertainable fair market value on May 23, 1955, of 50 cents per share.
 
 
 8
 1. Date when income was realized.
 
 
 9
 The Tax Court characterized the agreement for the sale of stock to petitioners as an 'option' and held that income was realized on the date when the option was exercised. The taxpayers argue that the agreement price of one mill a share was so minuscule ($150 for 150,000 shares selling publicly at 50 cents or more a share) that no one ever doubted that the right to purchase would be exercised. Therefore, the argument continues, the significant date is February 1, 1955, when the right to purchase vested. See Fleischer & Meyer, Tax Treatment of Securities Compensation: Problems of Underwriters, 16 Tax L.Rev. 119, 128-29 & n. 43 (1960).
 
 
 10
 The taxpayers do not argue that May 23, 1955 is an inappropriate date to determine the realization of income if the agreement for the sale of stock is viewed as an option. See Commissioner v. LoBue, 351 U.S. 243, 249, 76 S.Ct. 800, 100 L.Ed. 1142 (1956); Commissioner v. Smith, 324 U.S. 177, 179-182, 65 S.Ct. 591, 89 L.Ed. 830 (1945); Note, Taxation of Compensatory Stock Options: Capital Gain or Ordinary Income, 64 Yale L.J. 269 (1954). Since the parties chose to make the taxpayers' right to the stock dependant on the payment of a sum of money, the Tax Court could quite properly consider the taxpayers' right an option, thus giving effect to the transaction in the form in which the taxpayers molded it. Television Indus. Inc. v. Commissioner,284 F.2d 322, 325 (2d Cir. 1970). To distinguish, as the taxpayers would have us do, between transactions having the same form, in this case, the option form, on the basis of the amount of payment required would introduce unnecessary uncertainty into future cases.
 
 
 11
 We therefore conclude that the Tax Court did not err in holding that the income in question was realized on May 23, 1955, the date the option was exercised.
 
 
 12
 2. Ascertainable market value. The taxpayers assert that because of the speculative character of the option stock and certain restrictions on its transfer, the stock had no ascertainable market value on May 23, 1955, the date for which the Tax Court determined value.
 
 
 13
 The option stock purchased by Graham, Ross and Victorson was not registered or exempted from registration. The taxpayers agreed that they would hold the stock for twelve months from the effective date of the Regulation 'A' Notification covering the public issue. Glamur Products agreed that thereafter it would, on request, take the necessary steps to qualify the option stock for public sale.[1] When the options were exercised on May 23, 1955, the restriction on the sale of the stock still had some six months to run, and in fact it was not until August 9, 1956, that Glamur Products acted to qualify $50,000 worth of the option stock for public sale.
 
 
 14
 Victorson testified in the Tax Court hearing that although the agreement prohibited only a public sale and not a private placement, the restriction on transfer was in effect absolute since the speculative character of the stock made a private placement impossible.
 
 
 15
 Several cases have held that an absolute restriction on the transfer of a speculative security precludes the ascertainment of a market value. United States v. State Street Trust Co., 124 F.2d 948 (1st Cir. 1942) (twelve months); Schuh Trading Co. v. Commissioner, 95 F.2d 404, 411-412 (7th Cir. 1938) (six months); Helvering v. Tex-Penn Oil Co., 83 F.2d 518, 523 (3d Cir.1936), aff'd, 300 U.S. 481, 499, 57 S.Ct. 569, 81 L.Ed. 755 (1937) (90 to 180 days). On the other hand, 'where the underwriter gives the issuer an investment covenant in connection with the purchase of shares * * * the courts are in agreement that the investment covenant does not make the value of the stock unascertainable. The covenant is not regarded as preventing the sale of the stock, but merely making it necessary for the taxpayer to meet certain requirements preliminary to sale.' Fleischer & Meyer, supra at 131-32. See Thomas D. Conroy, 17 CCH Tax Ct.Mem. 21, 24-25 (1958); Edith G. Goldwasser, 47 B.T.A. 445, 456-457 (1942), aff'd per curiam, Goldwasser v. Nunan, 142 F.2d 556 (2d Cir.), cert. denied, Goldwasser v. C.I.R., 323 U.S. 765, 65 S.Ct. 119, 89 L.Ed. 612 (1944).[2]
 
 
 16
 The Tax Court had before it conflicting testimony concerning whether a private sale would in fact have been possible. It accepted the testimony of government witnesses that a private placement was possible and concluded that while the transfer restrictions diminished value they did not deprive the stock entirely of value. It was proper for the Tax Court, as trier of the facts, to reach these conclusions on the basis of its evaluation of the evidence. Sisto Financial Corp. v. Commissioner, 149 F.2d 268, 269 (2d Cir.1945); Arc Realty Co. v. Commissioner, 295 F.2d 98, 102, 103 (8th Cir.1961).
 
 
 17
 The evidence provides support for the Tax Court's finding that the fair market value of the option stock on May 23, 1955 was fifty cents a share. The flotation of the public issue had been successfully concluded in a relatively brief time. The market for the stock continued to be a fairly broad one, with eighteen dealers handling orders for the stock. The prices offered for the stock had risen after the close of the public flotation and in May, 1955 ranged between 75 and 93 3/4 cents a share. There was testimony that the company's product was a good one, and that it was widely distributed. The stock was looked upon as having favorable growth possibilities.
 
 
 18
 The Tax Court weighed this evidence against the effect on price of the restriction on sale and against the so-called 'blockage factor,' i.e. the necessity, if the stock was to be sold privately, of selling in large blocks.
 
 
 19
 We cannot say that the Tax Court's conclusion on this evidence ascribing to the stock a fair market value of fifty cents a share was clearly erroneous.
 
 
 20
 Affirmed.
 
 
 
 *
 The late Judge Charles E. Clark heard oral argument on this case but did not participate in its decision
 
 
 [1]
 It is unnecessary for the purposes of this case for us to pass upon the question whether the agreement satisfied Securities and Exchange Commission requirements
 
 
 [2]
 Treas.Reg. 1.421-6(d)(2)(i), which was made applicable to underwriters' stock options by Treas.Dec. 6696 (Dec. 11, 1963), provides that
 'If the option is exercised by the person to whom it was granted but, at the time an unconditional right to receive the property subject to the option is acquired by such person, such property is subject to a restriction which has a significant effect on its value, the employee realizes compensation at the time such restriction lapses or at the time the property is sold or exchanged, in an arm's length transaction, whichever occurs earlier.'
 The portion of the regulation referring to property transferred subject to a restriction which has a significant effect on its value is, by reason of a restriction in the regulation itself (Treas.Reg. 1.421-6(a)(2)(i)), not applicable to options exercised before September 25, 1959.