WILLIAM H. HUSTED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4244–64. Filed March 29, 1967.

*William Sondericker* and *Charles M. Waygood,* for the petitioner.
*Charles M. Greenspan* and *Charles M. Costenbader,* for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $291,-662.85 in the petitioner's income tax for 1959. However, at the trial the respondent increased the deficiency by alleging that the petitioner earned an additional $42,600 in 1959. The issues remaining for decision are: (1) Whether the petitioner, who arranged for the Dorsey Corp. to acquire a trailer-manufacturing business, received compensation when he was allowed to acquire Dorsey stock for less than its fair market value as part of the plan for the acquisition of such business; (2) whether the petitioner actually paid $42,600 for his Dorsey stock; and (3) what was the fair market value of the Dorsey stock acquired by the petitioner.

### FINDINGS OF FACT

Some of the facts were stipulated and those facts are so found.

The petitioner, William H. Husted, resides in New York City and filed an individual income tax return for the taxable year 1959 with the district director of internal revenue, Manhattan District, New York, N.Y. In such return, petitioner reported his occupation as "business promotion."

In the notice of deficiency mailed on June 2, 1964, respondent determined a deficiency of $291,662.85. In the explanation of adjustments in the notice, the respondent determined that in accordance with section 1.61–2(d)(2), Income Tax Regs., the petitioner received additional compensation of $333,600 in 1959 as a result of his acquiring Dorsey Corp. stock by paying less than the fair market value for it. The respondent further determined that the petitioner received $24,202.42 of unreported income consisting of reimbursement from Dorsey Corp. for his business expenses which he failed to substantiate as allowable under the Internal Revenue Code. He also determined other adjustments which are not in issue in this case. When the case was called for trial, the respondent's counsel stated that the petitioner had not paid for his stock in the Dorsey Corp. and, therefore, the entire value of such stock was part of petitioner's ordinary gross income. Although the respondent has not filed an amended answer setting forth allegations with respect to the claimed additional income of $42,600 or determined an increased deficiency based upon such income, we have considered the issue since both parties proceeded upon the assumption that it is an issue in the case, and no prejudice appears to have resulted from the failure to file an amended answer. At the trial, the parties

stipulated that the correct amount includable in the petitioner's gross income as a result of reimbursement of business expenses was $12,-202.42, rather than $24,202.42.

The petitioner has many years of experience in corporate finance, specializing in corporate acquisitions. His experience includes associations with Harold E. Talbott & Co., Curtiss-Wright Corp., Lear-Siegler, Inc., Olympic Radio & Television, Inc., and CTCV Cable Television Corp. In 1955, the petitioner was the principal organizer of the corporation which later became known as Lear-Siegler, Inc. He became its first president, a director, and later chairman of the executive committee. He made a number of corporate acquisitions on behalf of that corporation.

The petitioner was interested in acquiring privately owned businesses that had to be sold because of a death or because of taxes. It was his practice to arrange the acquisition and present it to a group of investors as a "finished deal." However, the petitioner has never accepted a fee for merely finding an acquisition and bringing it to the attention of others, nor is he known in the business community simply as a "finder." A professional finder is one who brings an acquisition to a buyer and receives a fee for that act alone.

During February 1958, the petitioner was informed that Dorsey Trailers, Inc., an Alabama corporation (Dorsey-Alabama), might be for sale. The person who brought this information to petitioner's attention was later paid a finder's fee for such information.

The petitioner sent Newell P. Crawford, an associate, to Alabama to examine the plant and to confer with J. V. Wright, president of Dorsey-Alabama, and with the executors of the Dorsey Estate. In addition, petitioner dispatched auditors and appraisers to Alabama to examine Dorsey-Alabama. Crawford prepared a financial report on the corporation, dated February 25, 1958.

After studying the operations and financial condition of Dorsey-Alabama in the spring and summer of 1958, the petitioner decided to arrange for the purchase of the corporation's assets and negotiated with its president regarding the terms of sale. On or about August 21, 1958, the negotiations resulted in the parties reaching a tentative agreement as to a price of $3,800,000 plus assumption of liabilities.

During the summer of 1958, the petitioner used Crawford's report and approached several lending institutions seeking funds to acquire Dorsey-Alabama. By November 1958, the petitioner had tentatively arranged the financing to consummate the purchase and indicated to his attorneys that they should proceed with the formation of a Delaware corporation (Dorsey-Delaware) which was to make the purchase. The funds necessary to consummate the purchase were to be obtained in part from the sale of stock of the new corporation to a group of individuals prominent in business and financial circles with

whom the petitioner had done business in the past and in part by loans from two lending institutions, Associates Discount Corp. and the Victoria Trust. The terms of the financing required the formation of the new Delaware corporation and a pledge of 100 percent of its common stock as security for the loan from Associates Discount Corp. It was proposed that the loans would be liquidated through funds obtained from a public offering of common stock in the company within 10 to 12 months after the acquisition of Dorsey-Alabama, but the cost of the proposed financing made it preferable to move forward the date of the public offering, if possible.

On November 10, 1958, the petitioner and Crawford conferred with officers of the Chemical Corn Exchange Bank (Chemical). The petitioner sought additional financing for the acquisition to the extent of $1,250,000 on bank interest rates of 5 to 6 percent.

The petitioner approached Blair & Co., Inc. (Blair), a firm of securities underwriters in New York City, to arrange the proposed public offering. Blair advised the petitioner that it would be preferable to merge Dorsey-Delaware with a corporation whose stock was listed on a national exchange so that the listed stock could be offered.

The petitioner mentioned Blair's suggestion to William O'Brien, a partner of the accounting firm of Alexander Grant & Co. O'Brien had worked on personal tax matters for Frank B. Johnston, chairman of the board of Allied International Investing Corp. (Allied), and, as a result, was familiar with that corporation's financial affairs. The petitioner was not previously familiar with Allied. O'Brien told him about Allied and asked him for permission to discuss with the corporation's officials the possibility of Allied participating in the Dorsey-Alabama acquisition.

Allied was a corporation organized in 1927 and as of 1958 its common stock was listed on the American Stock Exchange. In 1958 Allied had a capital deficit and a deficit in its accumulated earnings and profits of approximately $15 million and a net loss of $2,133.43 for the year. It was a holding company with assets at December 31, 1958, consisting of $315,547.10 in cash and Government notes and 56.19 percent of the common stock of Automatic Steel Products, Inc. It was seeking a profitable operating business. Allied had a history of stockholder dissension and litigation, and as of December 1958, two of its largest stockholders were attempting to obtain control of Allied from its then management.

The petitioner, Crawford, and O'Brien met with Johnston and John R. Maher, then directors of Allied, on December 16, 1958. Johnston and Maher were advised of the proposed acquisition of Dorsey-Alabama, and it was agreed that further discussions would be worthwhile. On December 17, 18, 19, and 22, 1958, petitioner, O'Brien, Johnston,

and Vanderbilt and Bryant of Blair, met at the Blair offices. These meetings resulted in a tentative understanding which was set forth in a letter dated December 22, 1958, from Blair to Allied.

The preliminary understanding was that the assets of Dorsey-Alabama would be acquired by Dorsey-Delaware. Dorsey-Delaware would issue 80,000 shares to petitioner, Crawford, and others associated with the management of Dorsey-Alabama for $1 per share. Allied would distribute all of its assets, other than $300,000 in cash and Government securities, and would then, before the acquisition of the Dorsey-Alabama assets and the public offering, sell 75,000 of its shares to Blair and certain others for $3 per share. Allied would acquire all the stock of Dorsey-Delaware in exchange for its stock on a share-for-share basis. Blair, alone, or together with other underwriters, would handle an underwriting to raise $2,500,000.

At a meeting of the board of directors of Allied on December 22, 1958, Johnston outlined the proposals contained in the Blair letter. The petitioner was invited to speak at that meeting and told the board that "we are trying to do here exactly what we did in the Siegler Corp. * * * We bought out the company at $11 a share and it is currently selling for $30 a share. We plan the same thing for Dorsey."

On the following day, the directors adopted a resolution approving the plan for the acquisition. However, on December 24, 1958, some dissident shareholders secured a restraining order preventing Allied from proceeding in accordance with the plan.

On January 19, 1959, the Allied directors adopted a resolution approving an alternative plan under which the acquisition of Dorsey-Delaware could be carried out if the outcome of the litigation be adverse to the Allied management. The alternative plan was not materially different, for purposes of this proceeding, from that outlined in the Blair letter. On February 2, 1959, the officers of the corporation were authorized to settle the shareholder's suit and to execute the alternative plan upon approval of the court. A final order of settlement in the litigation was approved by the court on March 13, 1959. The modified plan was approved by the Allied shareholders on March 16, 1959. The shareholders also authorized the board to change Allied's name to the Dorsey Corp. (Dorsey) and approved the plan to make the petitioner a member of the board of directors. The petitioner was elected to the board on March 17, 1959.

By memorandum dated January 9, 1959, Blair rendered its opinion that the 500,000 shares of Dorsey, formerly Allied, after giving effect to the acquisition of Dorsey-Alabama, should command a minimum market value of $10 per share. Also, Blair issued a memorandum dated March 26, 1959, to its representatives concerning the proposed new issue, which indicated that Blair expected to head a group of under-

writers who would handle the public offering of Dorsey on or about April 15, 1959, and that the common stock would be offered for $10 per share.

While he was arranging the financing of the acquisition, the petitioner conferred with A. Charles Schwartz, an officer of one of the largest securities firms. The petitioner informed Schwartz that he was arranging the financing to put the deal together. He explained what the deal was, inquired whether Schwartz as an individual would be interested, and whether his firm would be interested in acting as one of the underwriters in the subsequent offering to the public of Dorsey stock. After studying the situation, Schwartz replied, "Yes, it looks like a damn good deal." He bought some Dorsey stock for his wife at $3 per share on April 8, 1959, and his firm became a member of the underwriters group in the public offering of Dorsey stock at $11 per share.

The Victoria Trust was willing to loan Dorsey-Delaware $1 million for a 90-day period without cash interest. Victoria's compensation for such a loan was to be the opportunity to purchase 25,000 shares of Dorsey at $3 per share.

The petitioner entered into an assets purchase agreement with Dorsey-Alabama dated February 27, 1959. The purchase price was $4 million plus assumption of liabilities, and the petitioner paid $25,000 as a forfeitable downpayment. The agreement provided for a closing date of April 15, 1959, although the closing could be postponed until April 30, 1959, by the payment of a penalty. The agreement also provided that petitioner would cause a Delaware corporation to be organized and that petitioner would assign the purchase agreement to such a corporation. As a condition to signing the agreement, the shareholder-managers of Dorsey-Alabama had required the petitioner to promise that they could purchase 30,000 shares of Dorsey-Delaware for $1 per share. Also, the agreement required the petitioner to use his best efforts to secure the election of the president of Dorsey-Alabama as president of Dorsey-Delaware.

The petitioner's counsel formed Dorsey-Delaware on March 12, 1959. Thirty thousand shares of its stock were issued to the petitioner on April 15, 1959, for which he paid $30,000, $20,000 to Crawford, $20,000 to the president of Dorsey-Alabama, and $10,000 to other executives of Dorsey-Alabama. In the event that the acquisition by Dorsey did not materialize, the petitioner intended to dissolve Dorsey-Delaware and return its cash to its shareholders.

The petitioner assigned the asset purchase agreement to Dorsey-Delaware in exchange for $25,000. The written assignment obligated the petitioner to indemnify Dorsey-Delaware for losses incurred as a result of any inaccuracy in his representations and warranties. The

agreement required the petitioner to deposit 10,000 shares of Dorsey with the Irving Trust Co. of New York to secure performance of his indemnification agreement. However, there is no proof that any of such stock was ever deposited pursuant to such obligation.

On March 20, 1959, Dorsey filed a registration statement with the Securities and Exchange Commission in order to effect a public distribution of its securities pursuant to the Securities Act of 1933. A number of amendments to the registration statement were filed so that just prior to the public distribution, 32,500 shares of preferred stock were registered for public distribution and 395,000 shares of common stock were registered, but only 150,000 shares of the common stock were to be offered for sale to the public at that time.

On April 7, 1959, Dorsey distributed all of its assets except $315,700, and on the following day it sold 75,000 shares of common stock at $3 per share to Blair, the petitioner, and other purchasers designated by the petitioner. The petitioner allocated this stock among such purchasers in proportion to their losses in CTCV, a prior unsuccessful venture. The petitioner purchased 4,200 of such shares for his personal account and paid for all of them. The petitioner became the owner of such shares on April 8, 1959.

The purchase of the Dorsey stock by the petitioner Blair, and others was made subject to a repurchase agreement dated March 10, 1959. That agreement provided that a committee representing Dorsey could require the petitioner, Blair, and the others to resell their shares to Dorsey for $3 per share in the event that either the proposed acquisition failed to occur by June 30, 1959, or an equally attractive alternative acquisition was not presented to Dorsey by December 31, 1959. The repurchase agreement did not otherwise restrict the purchasers rights as Dorsey shareholders, or prevent the sale of their shares.

On March 10, 1959, the petitioner executed a "letter of investment" in which he warranted to Dorsey that he was acquiring his shares for personal investment and "without any intention of selling or distributing the same." In the original registration statement filed by Dorsey in connection with the proposed offering of its stock, the shares acquired by the petitioner were not registered, but in an amendment of that statement, such shares were registered although they could not be distributed publicly without the filing of a post-effective amendment of the registration statement. The stock certificates issued to the petitioner did not bear any restrictive legend.

On April 15, 1959, the petitioner entered into an agreement with Dorsey under which he agreed to exchange his shares of Dorsey-Delaware stock for an equal number of shares of Dorsey common stock on the closing date of the acquisition by Dorsey-Delaware of the assets of Dorsey-Alabama. He warranted in the agreement that he was

"acquiring all of said shares to be acquired by me for my own personal account for investment and without any intention of selling or distributing the same." These shares also were not registered by Dorsey in its original registration statement, but in an amendment of that statement, such shares were registered although they could not be distributed publicly without the filing of a post-effective amendment of the registration statement. The certificate relating to these shares did not bear any restrictive legend.

During January and February of 1959, the petitioner contacted other lending institutions to arrange less expensive financing than that offered by Associates Discount Corp., and on or about April 13, 1959, he arranged for a $1 million loan by New England Mutual Life Insurance Co. (New England). The New England loan was to be made to Dorsey-Delaware, guaranteed by Dorsey, and secured by a pledge of all the stock of Dorsey-Delaware. It was conditioned upon Dorsey having acquired all the stock of Dorsey-Delaware, Dorsey-Delaware having acquired the assets of Dorsey-Alabama, Dorsey having raised $2,850,000 by the sale of stock, and some other circumstances.

Additional financing was secured from Chemical by an agreement dated April 15, 1959. It provided that Chemical would lend up to $1 million to Dorsey-Delaware for a period of about 2 years. The loan was to be guaranteed by Dorsey and was conditioned upon receipt of the loan to be made by New England, Dorsey-Delaware having acquired the assets of Dorsey-Alabama, and Dorsey having raised $2,850,000 by the sale of its stock. The Victoria Trust did not participate in financing the acquisition.

In an agreement dated April 21, 1959, Blair, as representative for a group of underwriters, agreed to purchase from Dorsey a total of 150,000 shares of its common stock and 32,500 shares of its preferred stock for public distribution. Dorsey was to receive $10 per share for the common stock less expenses incidental to the underwriting. Performance of the underwriting agreement was conditioned upon the registration statement becoming effective, the listing of the common stock on the American Stock Exchange, Dorsey-Delaware's acquisition of the assets of Dorsey-Alabama, the exchange of Dorsey stock for that of Dorsey-Delaware, and the performance of the financing agreements with New England and Chemical. The underwriting agreement also contained an escape clause whereby Blair could terminate its obligation upon the occurrence of such events as a banking moritorium, material change of economic conditions, or a major calamity which materially affected the value of Dorsey-Delaware or Dorsey-Alabama properties. The registration statement became effective on April 23, 1959, and the public offering began on that day. The stock was offered at $11 per share, and all of it was sold within a reasonable time.

On April 30, 1959, a closing of the entire transaction took place. The petitioner and the other shareholders of Dorsey-Delaware exchanged all of their stock in that company for an equal number of shares in Dorsey. Dorsey-Delaware borrowed $750,000 from Chemical and $1 million from New England pursuant to the loan agreements. Dorsey guaranteed the New England loan, pledging all of the stock of Dorsey-Delaware as security. Dorsey received $3,027,500 from Blair as the proceeds from the public distribution. Dorsey-Delaware purchased substantially all of the assets of Dorsey-Alabama and the appropriate deeds, bills of sale, assignments, and related documents were signed and exchanged. After the purchase, Dorsey-Delaware took over the manufacturing business of Dorsey-Alabama and operated it with essentially the same management that had operated Dorsey-Alabama.

On May 22, 1959, the petitioner pledged as collateral for a loan the 34,200 shares of stock of Dorsey which he acquired during the preceding month. The lending bank would permit the petitioner to maintain an outstanding loan in a principal sum equal to two-thirds of the value of such stock. In determining the value of such stock, the bank used the closing market prices on Friday of each week. To obtain the loan, the petitioner executed a promissory note, which provided the lender could sell the Dorsey stock held as collateral in the event of any default. In addition, the petitioner gave the bank stock powers executed in blank and providing that the bank could sell the Dorsey stock without any further act by the petitioner.

The petitioner was a director and served as vice president and chairman of the executive committee of Dorsey until August 1960 when he resigned. After his resignation, he received compensation in the amount of $100,000 from Dorsey which the corporation said was for his services as an executive from April 1959 to August 1960 and his services in finding and developing another corporation acquired by Dorsey in 1960, in aiding Dorsey in its development since its reorganization, and in the acquisition of Dorsey-Delaware in April 1959.

On September 14, 1960, Dorsey instructed its stock transfer agent not to permit transfers of the petitioner's shares. Since the petitioner had purchased additional Dorsey shares on the open market, the stop order was revised on November 9, 1960, so that it applied only to the shares received by the petitioner in April 1959. Thereafter, petitioner's attorneys obtained from the Securities and Exchange Commission a no-action letter in which the staff indicated that it would recommend that the Commission take no action in the event that petitioner sold the shares he acquired in April 1959. Dorsey then notified the transfer agent to remove the stop order on petitioner's stock. Thereafter, petitioner sold his stock and paid capital gains taxes thereon.

The Allied or Dorsey stock was sold on the American Stock Exchange during 1958 and 1959. The sales on the exchange during the last 6 months of 1958 and the first 3 months of 1959 were sporadic and involved small blocks of stock. During such period, there were 2,900 shares sold on the exchange, and the largest volume in any one of these months was 700 shares. The prices for the sales during the last 6 months of 1958 ranged from $5\frac{1}{4}$ to $12\frac{1}{2}$; during January and February 1959, from $10\frac{3}{4}$ to $13\frac{1}{2}$; and during March 1959, from $13\frac{1}{2}$ to 17. The activity increased in April of 1959. Before the public offering on April 23, there were 2,900 shares sold with volume as high as 600 shares in 1 day. The prices for those sales ranged from $10\frac{1}{2}$ to 19.

After the public offering, the trading of Dorsey stock increased considerably. During the last 5 trading days of April, 5,900 shares were sold at prices ranging from 11 to $11\frac{3}{8}$. During the next 6 months of 1959, the number of shares traded on the exchange and the price range are set forth in the following table:

| Month | Number of shares sold | Price range | |
|---|---|---|---|
| | | High | Low |
| May | 26,100 | $11\frac{1}{4}$ | $9\frac{5}{8}$ |
| June | 6,200 | $10\frac{5}{8}$ | 10 |
| July | 12,700 | 11 | $9\frac{1}{2}$ |
| August | 11,800 | $10\frac{7}{8}$ | $9\frac{1}{8}$ |
| September | 24,500 | $11\frac{1}{2}$ | $9\frac{1}{2}$ |
| October | 10,300 | $10\frac{1}{2}$ | 9 |

OPINION

To decide whether the petitioner's acquisition of 34,200 shares of Dorsey stock constituted the receipt of compensation, we must ascertain whether he acquired such stock at a bargain and, if so, whether the purpose of selling it to him at a bargain was to provide him with compensation.

Ordinarily, a purchase of property does not result in the realization of income. This principle was applied by the Supreme Court in *Palmer* v. *Commissioner*, 302 U.S. 63 (1937), in which the Court found that the taxpayer was merely a purchaser and, accordingly, his purchase did not result in the receipt of income. Later, however, in *Commissioner* v. *Smith*, 324 U.S. 177 (1945), the Supreme Court made it clear that when stock is sold at a bargain for the purpose of compensating someone, such a purchase does constitute the receipt of income. Still later in *Commissioner* v. *LoBue*, 351 U.S. 243 (1956), the Court held that a bargain sale of stock to an employee because he is an employee is a compensatory sale. The result of these decisions is to leave us with the question of ascertaining whether Husted was merely a

fortunate or wise purchaser of stock or whether he was allowed to purchase it at a bargain for the purpose of compensating him.

In corporate organizations or reorganizations, such as the one before us, the facts are complex, and the purposes of the parties are not readily apparent. We have been presented with declarations of intent expressed by the petitioner and other parties to the transaction as to whether the stock acquisitions of the petitioner were intended to be compensatory. In sorting through these complex facts and evaluating these statements of intent, we must apply the directives of the Supreme Court in *Commissioner* v. *Duberstein*, 363 U.S. 278 (1960) ; we must apply our "experience with the mainsprings of human conduct" (363 U.S. 289) to learn the "basic" or "dominant" reason that explains the transferor's action.

We must first inquire whether Husted was allowed to purchase the Dorsey stock at a bargain. The plan for the acquisition of Dorsey-Alabama evolved over a period of months, and it changed from time to time. It took definite form after the negotiations with the representatives of Allied in December 1958. The Blair proposal of December 22, 1958, sets forth the plan as it stood at that time. By that time, the terms under which Husted acquired his Dorsey stock were agreed upon. He was to be allowed to participate in a direct sale of 75,000 shares of Dorsey stock for $3 per share, and the 30,000 shares of Dorsey-Delaware for which he was to pay $1 per share were then to be exchanged for an equal number of shares of Dorsey.

We have no evidence as to the public offering price which the parties contemplated in December 1958. However, we do know that in January 1959, Blair expected to offer the stock for $10 per share. We also know that in March 1959, Blair again expressed its plan to offer the stock for $10 per share. Thus, at or about the time that it was planned to make the Dorsey stock available to Husted for $3 and $1 a share, it was planned to offer the stock publicly for $10 a share.

We received expert testimony that the Dorsey stock was worth only its book value at the time Husted acquired his first 4,200 shares of Dorsey stock and that it remained at not much more than book value until the time of the public offering. Yet, we find it difficult to accept this expert testimony. True, there were still many contingencies that could occur and prevent the acquisition of Dorsey-Alabama. Perhaps the most important of these contingencies involved the successful completion of the proposed underwriting. However, despite these uncertainties, we think that investors would be willing to pay something for the mere possibility of participating in the acquisition of Dorsey-Alabama, and other evidence in this record establishes a value for the stock in excess of that suggested by the experts. Schwartz, an officer in one of the nation's largest securities firms and

a knowledgeable and experienced investor, considered it a very attractive offer to be able to buy the stock at $3 per share and purchased some for his wife. Victoria Trust, a lending institution, was willing to forego cash interest on a $1 million loan in order to be able to purchase the Dorsey stock at $3 per share. Finally, although the public trading in the stock at the time Husted acquired his 4,200 shares was relatively light, still, purchasers on the American Stock Exchange were paying $10.50 per share for the stock at that time. It is difficult to say how much more than book value the stock was worth prior to the public offering, but it strains credulity to ask us to believe that the stock was not worth more than $3 per share at that time. Despite the sophisticated analysis of the experts, we think that a realistic appraisal of this situation leads to the conclusion that the stock was worth significantly more than its book value on April 8, 1959, when the 4,200 shares were acquired.

Insofar as the 30,000 shares of Dorsey which Husted acquired in exchange for his shares of Dorsey-Delaware are concerned, we think it is apparent throughout the evolution and consummation of the plan that such acquisition was merely the final step in a plan designed to vest ownership of the Dorsey stock in him at a cost of only $1 per share. Though there were many hurdles to overcome before the plan was completed, and though there were many obstacles which could have prevented the successful completion of the plan, Husted knew that if it was successful, he would acquire stock which even his experts testified was worth a good deal more than the $1 per share which he paid for the Dorsey-Delaware stock. When all the steps in the plan were successfully completed and the closing took place, he received stock which was then being traded for approximately $11 a share in exchange for his stock for which he paid $1 a share.

Since we have found that Husted was allowed to acquire the Dorsey stock at a bargain, we must next decide what was the basic reason for allowing him to make such an acquisition.

Let us look first at what the petitioner did before he acquired his Dorsey stock. After he learned that Dorsey-Alabama was for sale, he spent substantial time and effort in arranging the acquisition. He made a tentative agreement for the purchase of the assets of Dorsey-Alabama, and this agreement was put in writing in 1959. He contacted the lending institutions to investigate the possibilities of financing and secured tentative commitments. He contacted the underwriter to discuss a public offering of stock. He had his legal assistants prepare plans relating to the corporate arrangements which would have to be made to acquire the Dorsey-Alabama assets.

Although Husted's original plans did not involve Dorsey, the change which brought him together with Dorsey does not affect our interpre-

tation of the ultimate reason for the bargain sale to him. He approached Dorsey because he needed to work with a corporation having a listed stock, but he also had something to offer them. He offered Dorsey an opportunity to acquire a profitable operating business—an opportunity that Dorsey was then seeking. He and Dorsey each had something to offer to the other, and they engaged in what we can assume was arm's-length negotiations. He had developed a plan for the acquisition of the Dorsey-Alabama business, and he had made most of the arrangements necessary to carry out the plan. Dorsey wanted that acquisition, and it seems clear to us that they were willing to pay Husted for his efforts in arranging it. It seems clear that Dorsey would not have offered the $3 stock to anyone who came along and wanted to purchase it; they had some reason for selecting Husted, Blair, and the others selected by Husted as the ones who would receive the preferential opportunity. Surely that reason was not merely to receive the capital contribution that those persons would make, for it was expected that a public offering could raise about $10 per share. The reason for including Husted must have been because of the plan which he offered them and the services which he had performed in the conception and development of that plan. We think that this reason is apparent from the repurchase agreement which Husted was required to execute with respect to the 4,200 shares. He was required to agree to return the stock to Dorsey for $3 per share if the proposed acquisition were not successful or if he could not arrange an alternative acquisition that was equally attractive. This agreement makes clear that Husted was sold the stock for $3 per share in consideration of his having arranged the acquisition. Experience tells us that in these circumstances the bargain sale was made to Husted to compensate him.[1]

Husted's acquisition of the 30,000 shares of Dorsey stock secured in exchange for his 30,000 shares of Dorsey-Delaware presents a somewhat different question. It is argued that the exchange of Dorsey stock for that of Dorsey-Delaware was a corporate reorganization within the meaning of section 368(a)(1)(B) of the Internal Revenue Code of 1954 [2] and that under section 354(a), no recognition of income results from the exchange of the shares. It is argued by Husted that there were sound business reasons for the creation of Dorsey-Delaware and for the exchange and that, accordingly, the tax-free character of the exchange must be recognized. We see the transaction differently.

---

[1] We reach this conclusion wholly independent of the statements contained in Exhs. YY and ZZ from the files of Chemical. Initially, these exhibits were admitted into evidence merely for the purpose of showing what statements were included in the records of the bank, but later we were asked to consider the truthfulness of the statements. However, we reject this request and have not considered these statements in reaching this conclusion.

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

In dealing with corporate reorganizations, we are required to place substance before form. *Gregory* v. *Helvering*, 293 U.S. 465 (1935). We recognize that there may have been good business reasons for the creation of a subsidiary whose stock was held by Dorsey; nevertheless, we wonder why Dorsey contracted to exchange its stock which was to be publicly offered at $10 per share for an equal number of Dorsey-Delaware shares which Husted had purchased for $1 on the same day. Surely Dorsey did not agree to a share-for-share exchange because it thought that Dorsey-Delaware's assets were worth that much. This exchange had been planned at a time when Dorsey-Delaware did not even exist. At the time the exchange took place, Dorsey-Delaware was little more than a corporate shell. It did have an option to purchase the assets of Dorsey-Alabama for which Husted had paid $25,000 but we hardly think that Dorsey would have exchanged stock worth over $800,000 for that option. Arrangements had been made to loan money to Dorsey-Delaware for the purpose of acquiring Dorsey-Alabama assets, but the benefit of those arrangements was in reality the product of Husted's personal services. See, *Harold L. Regenstein*, 35 T.C. 183 (1960). The only realistic explanation for the agreed-upon exchange ratio is that Husted was being provided with further compensation for his services in arranging the acquisition of Dorsey-Alabama. *Geo. S. Carter*, 36 T.C. 128 (1961). Section 356(f) [3] provides, in effect, that if the receipt of stock described in section 354(a) has the effect of the payment of compensation, then the gain is taxable as compensation under section 61(a)(1). The realities of this exchange, and the circumstances which gave birth to it, place it squarely within the terms of section 356(f). See *Philip W. McAbee*, 5 T.C. 1130 (1945), acq. 1946-2 C.B. 4; *Fifth Avenue Bank of New York, Executor*, 31 B.T.A. 945 (1934), affd. 84 F. 2d 787 (C.A. 3, 1936).

The measurement of the amount of compensation received by Husted as a result of these bargain purchases of stock requires us to consider what effect certain restrictions had upon the fair market value of his stock. Since the stock was transferred to Husted before September 25, 1959, we are not concerned with the rules of the regulations relating to the transfer of property subject to restrictions (see sec. 1.61-2(d)(5), Income Tax Regs.).

At the time the plan to transfer 34,200 shares to Husted was agreed upon, it is clear that the thing of value being transferred to him was the Dorsey stock when that company had acquired Dorsey-Delaware

---

[3] SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.

   (f) TRANSACTIONS INVOLVING GIFT OR COMPENSATION.—

For special rules for a transaction described in section 354, 355, or this section, but which—

      (1) results in a gift, see section 2501 and following, or

      (2) has the effect of the payment of compensation, see section 61(a)(1).

and the assets of Dorsey-Alabama. Therefore, the amount of his compensation depended upon the circumstances as they developed. He became the legal owner, for most purposes, of 4,200 shares on April 8, 1959, but his ownership was restricted and tentative. Its value in excess of his purchase price was uncertain and depended upon the successful completion of the planned acquisition. Since he could be compelled to return the stock should the acquisition or a similar acquisition fail to occur, his continuing ownership depended upon his ability to complete the acquisition and thereby bring about the enhancement in value of the Dorsey stock which was to be his compensation. Thus, the facts in this case are significantly different from *Robert Lehman*, 17 T.C. 652 (1951), nonacq. 1962-2 C.B. 7. In view of Husted's tentative ownership of 4,200 shares until April 30, 1959, the settlement date, and his actual receipt on that date of the remaining 30,000 shares under the same compensatory plan, that date is the only one upon which we should measure the value of his bargain. If all the parts of the plan could not be fitted together on that day, Husted would receive nothing for his efforts, but if all the steps took place as planned, he was entitled to retain the ownership of the 4,200 shares and to exchange the 30,000 shares. This acquisition of Dorsey stock at a bargain was like a bonus for the successful execution of the plan. Our selection of the correct valuation date is similar to the approach suggested by the Supreme Court in *Commissioner* v. *LoBue, supra,* for the situation in which an employee receives a compensatory option that lacks an ascertainable fair market value. See also *Commissioner* v. *Smith, supra.* In such a situation, the determination of the amount of compensation received by the employee is deferred until he exercises the option and acquires something having a definite value.

We received the testimony of two experts as to the fair market value of the Dorsey stock on April 30, 1959. One of them testified that the stock owned by Husted was worth between $4.75 and $5.25, and the other testified that his stock was worth between $4.20 and $4.60 per share at that time. Both experts were of the opinion that Husted's stock had to be discounted substantially because of the investment letter which he had given and because of the size of the block of stock which he owned.

We agree that there must be some discount for these reasons, but we think that the proposed discount is too large. The one witness provided us with an exhaustive discussion of his principles of valuation and their application to this situation. However, this witness seemed to give little consideration to the fact that on April 30, 1959, the Dorsey stock was being publicly traded for a price of $11 to $11.25. The activity in the stock at that time was substantial, and the market price of the stock held close to that range for the succeeding 6-month period for which we have information about its market prices. This witness,

by concluding that "Husted's or anybody else's" stock was not worth $11, was in effect saying that the stock was overpriced. However right he may be, we think that he gave inadequate consideration to the fact that people trading in the market place were paying around $11 per share for the stock. He gave no consideration to the fact that Husted was able to borrow 66 percent of that market value from a leading bank. The other witness first told us that an appropriate discount for the investment letter and the blockage would cause Husted's stock to be worth around $7 or $8 per share; and although he later reduced his valuation to the range of $4.75 to $5.25 per share, he did not explain why he increased the discount.

We have examined all the circumstances surrounding Husted's stock holding. Although the investment letter, as a practical matter, prevented Husted from selling the stock publicly for some period of time, it did not prevent him from selling the stock privately. *Victorson* v. *Commissioner*, 326 F. 2d 264 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court; *Jack I. LeVant*, 45 T.C. 185 (1965), on appeal (C.A. 7, May 18, 1966). Thus, Husted's situation differed from that in the case of *Harold H. Kuchman*, 18 T.C. 154 (1952), acq. 1952–2 C.B. 2. Because of his position with Dorsey, section 16(b) of the Securities and Exchange Act of 1934 (48 Stat. 881, 896) might apply to any sale of the stock which he would make within 6 months of its acquisition.[4] Although there is some legal uncertainty as to the applicability of section 16(b) in this situation, it is enough for us to recognize that the possibility of its applying constituted a deterrent to the sale of the stock within 6 months. Husted's holding of 34,200 shares represented a significant portion of the outstanding stock and exceeded the amount of stock sold on the exchange in April or in any of the other 6 succeeding months. However, we know that 150,000 shares were sold through the underwriting in the last part of April and the first part of May; and though there would no doubt be some difficulty in finding a placement for another 34,000 shares, we are inclined to think that it would not have been impossible. Taking all these circumstances into consideration, we conclude that a fair market value of $7 per share for the stock on April 30, 1959, is appropriate.

The respondent has raised an issue as to whether Husted actually paid anything for the 34,200 shares of Dorsey stock that he acquired, but we have found that in fact he did pay $3 per share for 4,200 shares and $1 per share for 30,000 shares. Since the respondent first raised this issue at the trial, he had the burden of proof, and we did not find his evidence convincing.

---

[4] The answer to the question of whether sec. 16(b) applies to stock issued as compensation is far from clear. See *Greene* v. *Dietz*, 247 F. 2d 689 (C.A. 2, 1957) ; 2 Loss, Securities Regulation 1114 (1961). If applicable, sec. 16(b) would permit Dorsey to recover any profits made by the petitioner upon a sale within 6 months of his purchase.

In order to calculate the effect of the settlement of the reimbursed expense issue and of our determination of the amount Husted received as compensation,

*Decision will be entered under Rule 50.*