George D. Meriwether and Sherron F. Meriwether v. Commissioner.
Meriwether v. Commissioner
Docket No. 2732-69.
United States Tax Court
T.C. Memo 1971-297; 1971 Tax Ct. Memo LEXIS 36; 30 T.C.M. (CCH) 1256; T.C.M. (RIA) 71297; November 23, 1971, Filed *36 Petitioner made three personal loans totalling $23,200 to the president of a closely held loss corporation. The loans were cancelled by petitioner in consideration of which petitioner was to receive, from the president of the corporation, 6,200 shares of that corporation's stock. As part of the cancellation agreement, petitioner also promised to become executive vice president of the corporation and to cosign a note for the corporation. Held, petitioner did not receive compensation income equal to the amount by which the value of the stock he received upon cancellation exceeded the amount of the cancelled loan. If indeed a bargain cancellation did exist, the record does not indicate that petitioner performed any services for the corporation in respect of which the alleged bargain would represent compensation. George D. Meriwether, *37 pro se, 3014 3rd Ct. , East, Tuscaloosa, Ala. Robert G. Faircloth, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent asserted a deficiency in petitioners' income tax for the taxable year 1965 in the amount of $7,300.36. At trial and pursuant to Rule 17(a), Tax Court Rules of Practice, respondent amended his answer to place a deficiency of $9,419.30 in issue. We must decide whether male petitioner received compensation income when a debt owing to him was cancelled in 1965 by the transfer to him of stock, 1257 such stock allegedly having a fair market value in excess of the amount of the debt. Findings of Fact Some of the facts have been stipulated and, along with the exhibits pertinent thereto, they are herein incorporated by this reference. Petitioners are residents of Tuscaloosa, Ala., and filed their joint income tax return for 1965 with the district director in Chamblee, Ga. Hereafter, "petitioner" will be deemed to refer to male petitioner, George D. Meriwether. For several years prior to 1964, petitioner was employed by the First National Bank of Tuscaloosa, Ala., as a vice president in charge of the bank's *38 installment loan department. Beginning in late 1964 and early 1965, petitioner assumed management duties for Crown Investment Corporation ("Crown"). By June 1965, petitioner had become executive vice president of Crown. Petitioner's 1965 return indicates Crown as his employer and his salary with Crown as $9,050. One E. E. Rivers was in the advertising business and a customer of the First National Bank of Tuscaloosa. He was acquaintdd with petitioner. In the early part of 1964, Rivers and his wife owned 10,000 shares of Crown, and Rivers was the president of Crown. On three occasions in late 1964 and early 1965, petitioner personally loaned amounts of money to Rivers. The dates of these loans and the corresponding amounts are as follows: Date
Amount
November 20, 1964
$13,600
December 30, 1964
8,000
January 30, 1965 1,600
Total
$23,200 In connection with the aforesaid loans, Rivers executed three promissory notes to petitioner, each note payable one year from the date of the loan. Rivers executed these notes in his name only and not in the name of Crown. Also, these loans were not consummated under the auspices of the bank where petitioner was employed. *39 The three loans were personal transactions between petitioner and Rivers. Rivers utilized the borrowed funds to obtain additional stock in Crown. On February 8, 1965, petitioner and Rivers orally agreed to cancel the three notes. At this time, Rivers agreed to transfer 6,200 shares of Crown stock to petitioner in exchange for (1) the cancellation of the three notes; (2) petitioner's agreement to assume the position of executive vice president of Crown; and (3) petitioner's agreement to cosign with Rivers a $219,000 note for Crown's benefit to the Gulf States Paper Corporation. Petitioner did become executive vice president of Crown and the note was eventually cosigned with Rivers. The 6,200 shares of Crown stock destined for petitioner were transferred in two blocks and in two different manners. The first block was a 600-share transfer on February 8, 1965, accomplished in conjunction with Rivers' program of buying additional but previously unissued shares of Crown with the funds borrowed from petitioner. Rivers used the November loan proceeds to purchase an additional 1,700 shares at $8 per share. With the $9,600 proceeds from the December and January loans he caused the corporation *40 to issue on February 8, 1965, 600 shares to his wife and 600 shares to petitioner. The second block, 5,600 shares, was transferred by Rivers' wife, Dora, on June 9, 1965, to petitioner's wife in her name and as custodian for petitioner's children. Crown stock was not publicly traded although there were occasional purchases of previously unissued Crown stock. On January 23, 1964, John C. Malone, who had no connection with Crown, purchased 4,000 shares of Crown for $25,000 ($6.25 per share). At trial, Rivers testified that in January 1965 he and his wife owned 10,000 shares of Crown stock for which $40,000 had been paid in the aggregate ($4 per share). Rivers used the loan proceeds to purchase unissued stock at $8 per share. On May 1, 1965, petitioner purchased 100 previously unissued shares at the same price. Crown operated at a loss during the taxable period involved here. Respondent in his deficiency notice determined that the stock transferred to petitioner in 1965 had a fair market value in excess of the amount of the debt cancelled and that such excess represented compensation for services performed by petitioner. Petitioner has denied that he received any compensation from *41 this debt cancellation; that the only compensation he received in 1965 from Crown was his salary; and that, in any event, the stock received upon cancellation of the debt was equal in value to the amount of the debt. 1258 Opinion We must determine whether petitioner negotiated a bargain cancellation of the debt owing to him or whether the cancellation was a scheme to provide him with compensation for services performed. The facts here reveal that petitioner had, in late 1964 and early 1965, loaned $23,200 to the president of a closely held loss corporation. Within eight days of the final $1,600 loan to Rivers (the president of the corporation), the debt was cancelled and an oral agreement was reached whereby petitioner would receive 6,200 shares of the corporation's stock in consideration of which petitioner would cancel the debt, become executive vice president of the corporation, and would cosign a note with Rivers. It is well established that a mere purchase of property does not result in the realization of income. Palmer v. Commissioner, 302 U.S. 63 (1937). On *42 the other hand, it is equally well established that if stock is sold at a bargain for the purpose of compensating an individual, such purchase does constitute the receipt of income by the purchaser. Commissioner v. Smith, 324 U.S. 177 (1945); Commissioner v. Lobue, 351 U.S. 243 (1956). This dichotomy is resolved by ascertaining whether the taxpayer is merely a wise or fortunate purchaser of stock or whether he was allowed the bargain for the purpose of compensating him. William H. Husted, 47 T.C. 664 (1967). Section 1.61-2 (d)(2), Income Tax Regs., is clear that if property is transferred by an employer to an employee for an amount less than its fair market value, regardless of whether in the form of a sale or exchange, the difference between the amount paid and the fair market value at the time of the transfer is taxable compensation. Petitioner in this case has exchanged his $23,200 debt and two additional promises for 6,200 shares of Crown stock. Respondent has asserted in his deficiency notice that the value of the stock exceeded the amount of the debt cancelled and that services were performed by petitioner *43 as a quid pro quo for this bargain; ergo petitioner has received compensation income equal to the difference between the amount of the debt and the fair market value of the transferred stock. The question of the actual existence of the bargain aside for the moment, it is necessary and essential to respondent's case that a direct relationship be found between the alleged bargain and certain services performed by the petitioner for the corporation. Such services must be the consideration for the bargain element. In this case, the service element, if present, can only be found in the duties petitioner performed for Crown as manager or executive vice president, or in the additional promise to cosign a note tendered by petitioner upon the cancellation of the debt. The record in this case is such, however, that there is no service element which will stand as consideration for the alleged bargain. No doubt petitioner did perform some managerial services for Crown beginning in late 1964 and early 1965. Indeed, at trial, petitioner did indicate that sometime in late 1964 or early 1965, he did cause a financial statement of Crown's operation to be prepared. However, this occurred before *44 any verbal agreement as to the debt cancellation was reached by the parties. Aside from the preparation of a financial statement, the record does not reveal any other managerial duties, either from a qualitative or quantitative standpoint, which may be tied to the alleged bargain. Also, there is no doubt that petitioner did become executive vice president of Crown in June 1965. But again, the record is barren with respect to the nature of that position. It is impossible to determine whether the new position fashioned new responsibilities for which petitioner would be compensated by the alleged bargain in the debt cancellation. It may very well be that the position of executive vice president was a position requiring few duties or a position which was simply a better vantage point for petitioner to observe the workings of this corporation in which he had now become a stockholder. In the absence of a more detailed record, the new executive position cannot be tied to the alleged bargain. Petitioner received a $9,050 salary from Crown in 1965. The reasonableness and adequacy of that salary is not disputed and the record does not indicate any written agreement to furnish petitioner with *45 any additional salary, either in the form of cash, stock, or a bargain debt cancellation. Further, the promise made by petitioner on February 8, 1965, to cosign the note to Gulf States and his subsequent fulfillment of that promise are not sufficient proof of "service performed" for Crown. Petitioner's 1259 cosignature on the note to Gulf States Paper Corporation was clearly within his interest as stockholder in Crown. It is not unusual for stockholders to concern themselves with the financial dealings of their companies. One is compensated for rendering services, securing customers, developing new lines of trade, etc. - not merely for cosigning a note for the corporation's benefit. If no direct relatingship can be drawn between the alleged bargain element in the debt cancellation and specific services rendered for such bargain, a finding of compensation income is unwarranted. On the basis of the meager record before us, we are satisfied that there was no service element to tie to the alleged bargain acquisition in this case. Respondent's assertion of compensation income is unfounded *46 on the record. As to the existence of the bargain itself, the record is again spotty, save for indications of isolated transactions in unissued treasury stock of Crown. Crown was closely held and its stock was not regularly or even occasionally traded on any market. Unissued treasury stock had been issued for as low as $6.25 per share and as high as $8 per share, and in early 1965, Rivers and his wife were holding 10,000 shares of Crown stock at an average cost of $4 per share. However, Crown had been operating at a loss and, indeed, these isolated purchases of unissued treasury stock may indicate a somewhat optimistic and inflated value. In view of our opinion that no service element existed here, our consideration of the amount of the bargain in the debt cancellation, if any, becomes somewhat academic. With a paucity of information in the record regarding the financial soundness of Crown, its operations, and its prospects for the future, we can only say at best, that some bargain may have been obtained by petitioner. It is impossible to determine actual fair market value of Crown stock solely on the basis of the infrequent treasury stock purchases of Crown stock. Another point *47 must be emphasized. The record does not show that Rivers was the alter ego of Crown. His relationship to Crown and his activities in its behalf cannot be gleaned from the record. We note that the three loan transactions between petitioner and Rivers were personal between those two parties and that absent a finding that Rivers was the alter ego of Crown, it can well be that petitioner was cancelling his debt in order to obtain a possibly fruitful investment in Crown. The situation in this case can be analogized to a bargain purchase of stock by an individual where the individual has rendered no services to the corporation whose stock he is purchasing. Decision will be entered for the petitioners.