OLIVER R. ASPEGREN, JR., AND IDA M. ASPEGREN, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7142–65.   Filed March 12, 1969.

*David P. List* and *William Louis Kelley*, for the petitioners.
*Lewis M. Porter, Jr.*, and *Sheldon Chertow*, for the respondent.

FAY, *Judge:* Respondent determined a deficiency of $51,675.16 in petitioners' income tax for the taxable year 1960.

The issue is whether petitioner Oliver R. Aspegren, Jr., received compensation in the form of a bargain purchase of stock and thereby realized gross income under section 61.[1]

#### FINDINGS OF FACT

Some of the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Oliver R. Aspegren, Jr., and Ida M. Aspegren are husband and wife. They filed a Federal joint income tax return on the cash basis of accounting for the taxable year 1960 with the district director of internal revenue, Chicago, Ill. They were legal residents of Evanston, Ill., when they filed the petition in this case. Because Ida M. Aspegren is a party to this case only by virtue of filing a joint return with her husband, the latter is hereinafter referred to as petitioner.

Since 1947 petitioner has been in the business of selling life insurance in Illinois. He has been the president of the Aspegren Agency, Inc. (hereinafter referred to as the agency), since its incorporation in 1956. The agency is the sales agent in Illinois for the Ohio National Life Insurance Co. The overwhelming portion of the sales of the agency during 1960 and prior thereto consisted of mortgage life insurance. This type of insurance is issued on the life of a mortgagor of residential property to provide for payment of the balance of the mortgage in the event of his death.

Petitioner received monthly reports of the volume of the agency's business. The reports were contained in a cumulative chart starting in 1956. He received the reports within 2 or 3 days after the end of

---

[1] All statutory references are to the Internal Revenue Code of 1954.

each month. The volume of the agency's business is the total death-benefit coverage forwarded to the insurance company for acceptance. Petitioner considered the volume to be an indicator of the business condition of the agency.

The volume of the agency grew to almost $46 million in the calendar year 1956. During 1957 through 1959 the volume leveled off to an annual average of about $42 million.

During the 9-month period prior to April 1960, the volume of the agency's business decreased 23 percent from the 9-month period prior to April 1959. This was the greatest decrease the agency had ever experienced over a sustained period.

Petitioner did what he could to counteract the decline. He increased the agency's sales force and improved the efficiency of the existing sales force. In addition, during February 1960 petitioner contacted North American Life & Casualty of Minneapolis (hereinafter referred to as North American) about the possibility of selling its life and other insurance.

After consulting with his staff, however, petitioner decided that the basic reason for the volume decrease was that mortgagors could no longer make the relatively large downpayments required by lenders. Mortgagors accordingly sought additional financing for the down-payments from friends and relatives on a short-term demand basis. Because of this additional financing, mortgagors were not in a position to make a continuing commitment to purchase mortgage life insurance.

About the middle of April 1960 Spiros W. Kallas (hereinafter referred to as Kallas) visited petitioner's office without an appointment. Petitioner had no prior knowledge of Kallas. Kallas told petitioner that he owned a corporation which held a noncancelable contract to sell insurance for Mortgage Guaranty Insurance Corp. (hereinafter referred to as MGI) in Illinois. He lived in Wisconsin and had to commute to Illinois to conduct his MGI business. He said he was growing tired of commuting to Illinois and wanted to hire a subagent to help sell insurance there. Kallas asked if petitioner would be willing to become this subagent.

Although petitioner had heard passing references to MGI, he had no knowledge of its operations. He assumed that MGI competed with the company he represented. Kallas explained, however, that MGI insured mortgage lenders from default of mortgagors and did not sell mortgage life insurance. Petitioner then realized that selling both types of insurance might be a good business combination. MGI insurance would permit lenders to require lower downpayments because a portion of the mortgage debt would be insured. As a result, the mortgagor would be in a position to make a continuing commitment to purchase mortgage life insurance. Petitioner thus saw that selling MGI insurance

could be the answer to his problem of declining business. He also saw that if a competitor of the agency obtained the right to sell MGI insurance, the competitor's position vis-a-vis the agency would be substantially enhanced. Petitioner therefore indicated an interest in selling MGI insurance in Illinois.

Kallas thereupon offered petitioner a subagent arrangement with his corporation. Petitioner told Kallas, however, that he would want to be MGI's general agent, not a subagent of another person's corporation. They then discussed the possibility of a sale of Kallas' corporation to petitioner. In this connection, they had some general discussion concerning a price for Kallas' corporation. At the termination of the meeting petitioner felt that he could purchase the corporation for $25,000 or less. Because this price was attractive to him, he asked for time to investigate MGI and Kallas' proposal. Kallas indicated that he would wait only a few days before approaching petitioner's competitors.

Soon after his discussion with petitioner, petitioner's name came to the attention of Max Karl (hereinafter referred to as Karl), president of MGI. Karl was informed of petitioner's interest in representing MGI in Illinois.

Karl desired to obtain a new agent for Illinois. He was looking for somebody who had an adequate sales force to cover the territory properly. Although Kallas had promised to move to Illinois, he had not done so. He was therefore working only part time on MGI's Illinois business. The economic disadvantage of not fully exploiting the Illinois market was a serious concern to Karl.

Soon after his talk with Kallas, petitioner arranged a meeting with Karl. He made the arrangement through a mutual friend. The meeting took place in Milwaukee, Wis., on or about April 17, 1960. In the meeting, Karl and petitioner discussed generally the history and organization of MGI. To reduce the time necessary to explain MGI's business, Karl gave petitioner a prospectus dated February 25, 1960, which contained background material on the company. There was also a discussion about petitioner's meeting with Kallas. In this connection, petitioner stated that he thought he could buy Kallas' corporation and thereby obtain the MGI agency for Illinois. He also stated, however, that he preferred not to buy the corporation because of possible undisclosed liabilities. He therefore expressed a desire to get the MGI agency for Illinois in some other manner.

No agreement was reached at this meeting. It was decided that petitioner would consult further with his attorney and staff. It was also decided that petitioner and Karl would meet again in a few days.

In their first meeting, neither petitioner nor Karl discussed a purchase of MGI stock by petitioner. Nor was there a discussion of market values of any stocks.

Petitioner's second meeting with Karl took place in Milwaukee on or about April 21, 1960. By that time petitioner had decided to undertake the MGI Illinois agency if possible. His objective was to obtain the commission rates and noncancelable feature of Kallas' contract without acquiring Kallas' corporation. Petitioner and Karl had an extended discussion of various methods of achieving this end. They finally agreed that MGI would buy out Kallas' rights and that a noncancelable agency agreement, identical in all material respects to Kallas' agreement, would be entered into with a corporation to be formed by petitioner. The parties to the contract would be petitioner's new corporation and Guaranty Insurance Agency, Inc. (hereinafter referred to as GIA), a corporation organized to fund commissions paid to agents selling MGI insurance.[2] Petitioner and Karl also agreed that GIA would have the right to all renewal commissions on insurance Kallas' corporation had previously sold. Such renewal commissions would be an offset to the amount paid to Kallas.[3] Petitioner was never informed of the details of MGI's buy-out agreement with Kallas.

After reaching a conclusion with Karl with respect to the MGI agency in Illinois, petitioner offered to purchase approximately $20,000 worth of MGI and GIA stock. The stock of both companies was covered by the prospectus of February 25, 1960. Karl explained that the stock was sold in units consisting of four MGI shares and one GIA share for a total price of $115. Petitioner then set his offer at 200 units, or $23,000.[4] Karl agreed to this. Both of them considered this a firm commitment. The agreement was not, however, reduced to writing. Petitioner then asked if he could pay for the stock later. He explained that he had not brought the proper checks to Milwaukee and that he would have to transfer money from a savings account to a checking account to make the payment. Karl replied that there was no need to pay for the stock immediately.

Petitioner regarded his stock purchase as evidence of confidence in MGI, as a means of maintaining a status with the home office in a capacity other than agent,[5] and as an investment. It was his understand-

---

[2] The individuals who organized MGI also organized GIA. As of Feb. 25, 1960, the two corporations had substantially the same shareholders.

[3] If petitioner had purchased Kallas' corporation, he would have had the right to these renewal commissions.

[4] Petitioner's 200 units consisted of 800 shares of MGI and 200 shares of GIA. On Sept. 28, 1960, MGI stock split 10 for 1. On the same day GIA was liquidated as a step toward merging it into MGI. As consideration for the liquidation of GIA, its stockholders received 6 post-split MGI shares for each share of GIA stock. On Oct. 1, 1960, MGI acquired the assets and assumed the liabilities of GIA, thereby completing the merger. Taking into account the MGI stock split and the merger of GIA into MGI, each stock unit under the Feb. 25, 1960, offering ultimately consisted of 46 shares of MGI stock at an adjusted price of $2.50 per share. Thus, petitioner ultimately owned 9,200 shares of MGI stock as a result of his original purchase of 200 units.

[5] Petitioner made a similar purchase of stock in another insurance company which he began representing in 1960. He bought 1 percent of the outstanding stock of North American for $282,500.

ing that the purpose of the February 25, 1960, offering was to raise capital for MGI and GIA.

Karl did not, during the meeting on or about April 21, 1960, or, at any time prior thereto, discuss with petitioner whether MGI and GIA stock had a market value. Nor did petitioner inquire about such a value. Based on his knowledge of relatively new insurance companies, petitioner would not have considered any trading prices to be important.

After his second meeting with Karl, petitioner proceeded to form a corporation to enter into an agency agreement with GIA. The corporation had to be cleared through both the secretary of state of Illinois and the Illinois commissioner of insurance. This procedure was not begun until the name of Kallas' corporation was freed for use by petitioner's corporation. As a result, the corporation was not formed until June 1, 1960.[6]

On June 3, 1960, an agency agreement was executed by petitioner's corporation and GIA. This agreement was identical in all material respects to the agreement between Kallas' corporation and GIA. The agreement with petitioner's corporation provided for exactly the same compensation for its services that Kallas' corporation had received for its services. The contract between GIA and petitioner's corporation was the only agreement which required petitioner, either directly or through his corporation, to perform servicess for MGI or GIA.

Shortly after his second meeting with Karl, petitioner was involved in meetings of savings and loan officials in Washington, D.C. He was also busy establishing a new department in the agency for selling the insurance of North American.[7] Moreover, he was preparing to assume the presidency of the Chicago Life Underwriters Association. In addition, he and his family were involved in an automobile accident on June 12, 1960, in which his son was killed. As a result of the accident, petitioner was hospitalized for over 2 weeks with all of his ribs broken. He did not return to his office until early July, and then he worked only on a part-time basis.

Early in July 1960, Karl met with petitioner in Chicago. Karl advised petitioner that the boards of directors of MGI and GIA had decided to wind up the February 25, 1960, offering in contemplation of a new offering to raise substantially more capital.[8] Karl asked petitioner to pay for his shares of MGI and GIA stock. At this meeting there was no discussion of the value of MGI and GIA stock.

On July 28 petitioner paid for his MGI and GIA stock by sending checks for $20,000 and $3,000 to MGI and GIA, respectively. He

---

[6] Petitioner has been the sole shareholder and president of this corporation since the time of its formation.

[7] This department later became larger than the agency's mortgage life insurance department.

[8] The offering of Feb. 25, 1960, was terminated on Sept. 28, 1960.

signed an investment-intent letter directed to MGI and GIA dated July 28, 1960. In the letter he agreed not to sell the stock for 6 months. Karl and petitioner did not discuss the value of MGI and GIA stock at any time between their early July meeting and July 28.

MGI was organized on November 15, 1956, as a Wisconsin corporation. In March 1957 Wisconsin officials authorized it to engage in the business of insuring mortgage lenders against credit losses. GIA was organized on February 25, 1957, as a Wisconsin corporation.

MGI and GIA had the following financial results for the periods indicated:[9]

### MGI

| | Years ended Dec. 31— | | 11 months ended Nov. 30— |
|---|---|---|---|
| | 1957 | 1958 | 1959 |
| Net income | ($52,744) | ($14,673) | [1] $71,186 |
| Net investment income | 11,214 | 20,599 | [1] 33,167 |

### GIA

| | Years ended Jan. 31— | | 10 months ended Nov. 30— |
|---|---|---|---|
| | 1957 | 1958 | 1959 |
| Net income (loss) | ($26,722) | ($14,509) | [1] ($62,409) |

[1] Unaudited figure.

The principal part of MGI's business has always been insurance written on mortgage loans made by savings and loan associations. As of November 30, 1959, MGI's insurance in force was approximately $98 million. Its maximum potential liability on the insurance was 20 percent of that amount, or $19,600,000. As of November 30, 1959, MGI had net assets of $1,124,845, including a contingency fund of $156,427.

At the beginning of 1960 insuring residential mortgages was a field dominated by the Federal Housing Administration. There were a few private organizations, if any, offering such insurance. At one time there had been a number of private companies offering mortgage insurance. However, many of these companies either failed or dropped the mortgage insurance line in the early 1930's after sustaining severe losses.[10] Accordingly, there was little or no experience of private

---

[9] The data in this paragraph and in the following paragraph are gleaned from the prospectus of Feb. 25, 1960.

[10] These companies did not limit their liability on insured mortgages. MGI, on the other hand, had the option to settle any claim for 20 percent of the mortgage indebtedness by forfeiting all rights to the property. Furthermore, MGI insured only residential mortgages with monthly amortization resulting in a constantly declining risk. The other companies primarily insured commercial mortgages which generally did not provide for periodic amortization.

companies to serve as a guide upon which to estimate the risks involved in MGI and GIA. The experience of Federal agencies could serve as a guide only with reservations and limitations because of the relatively large scale of their operations and because of the higher loan limits permitted by law when insurance is procured from such agencies. Due to the paucity of comparable business experience in the field, it was necessary at the beginning of 1960 for a private mortgage insurance company such as MGI to maintain a high ratio of capital, surplus, and reserves to risks insured.

The regulations of the Wisconsin Department of Insurance required MGI to establish a contingency reserve for a period of 180 months to protect against the effect of adverse economic cycles. Effective September 1, 1959, the contingency reserve was based upon 50 percent of all earned premiums. The reserve was to be available for loss payments if losses in any year exceeded expected losses by 10 percent of earned premiums. In addition to the reserves required by law which included the contingency reserve and a "case basis" reserve, MGI maintained sufficient surplus to create a reserve of 10 percent of earned premiums.

On January 31, 1960, MGI had outstanding 72,544 shares of stock. On the same date, GIA had outstanding 18,080 shares of stock. The prospectus of February 25, 1960, covered 40,000 shares of MGI and 10,000 shares of GIA.[11]

One objective in setting the price of the stock in the February 25, 1960, offering was to avoid diluting the interest of existing shareholders who had risked their money in the business when it was just commencing. There was no relationship between the offering price and prospects for growth in the two companies. The prospects for growth were too indefinite to contribute to pricing the stock. MGI would have been subject to penalties if it had sold the stock covered by the offering of February 25, 1960, for any price other than that stated in the registration statement without a termination or amendment of the registration statement.

On November 30, 1959, the book value of each share of MGI was $13.35 and the book value of each share of GIA was 81 cents.[12] If all of the shares under the February 25, 1960, offering had been sold, the purchasers thereof would have collectively held approximately 35 percent of the two companies for which they would have paid $1,150,000. The preoffering shareholders paid $1,280,200 for their 65-percent interest in the companies. The interests of the purchasers under the offering were subject to further dilution because of outstanding options held by employees of the two companies. These options covered

---

[11] This was several months prior to the MGI stock split and the merger of GIA into MGI.

[12] These values are based on unaudited figures.

18,816 shares of MGI and 4,704 shares of GIA at prices substantially lower than the price under the February 25, 1960, offering.

The first page of the February 25, 1960, prospectus represented that the securities offered thereunder were speculative. It also stated that, as of February 25, 1960, there was no quoted market in the securities.

MGI and GIA were unable to obtain permission from several States to sell their stock under the February 25, 1960, offering. Texas refused such permission because its officials considered the offering price too high.

The February 25, 1960, offering was not underwritten. It was made directly by the companies through their executive officers. Authority to determine how many shares a person could buy was given by the boards of directors of the companies to Henry Bubb, chairman of the boards, and to Karl.

The purpose of the February 25, 1960, offering was to obtain capital for MGI and GIA. Karl and the other officers of the companies felt that officials of savings and loan associations and other mortgage-lending institutions would be better able than most people to understand the business of MGI. This group was therefore regarded as the primary market for the offering. The prospectus of February 25, 1960, accordingly provided:

> The Common Stock is not being offered to the public generally, but only for investment to certain selected executives of mortgage lending institutions. * * *
>
> All of the persons to whom the offering is to be made will be required, as a condition to each purchase of Common Stock, to represent that such purchase is not made with a view to distribution, and to agree not to resell any stock so purchased for a period of six months.

Karl tried to stimulate interest in the stock offering by telling prospective purchasers that there was a maximum number of shares available to each individual. If a person asked for more shares, however, Karl indicated that there would be a special exception in his case. In spite of these efforts, the offering did not go well. Karl accordingly sold the stock to people who were not associated in any way with mortgage-lending institutions.[13] During the period of the offering, 15,032 shares of MGI and 3,758 shares of GIA were sold out of the total offering of 40,000 and 10,000 shares, respectively.

Eighteen of MGI's agents purchased stock under the February 25, 1960, offering. MGI had approximately 200 agents who received commissions in 1960. It had 29 agents who received commissions in excess of $1,000. Of this number, 20 received less than $5,000, 7 received

[13] Karl was apparently not willing, however, to sell the stock to every person who expressed an interest in it. The record does not disclose the reason for this attitude. Nor does it disclose the criteria, if any, he used to select those people to whom he was willing to sell the stock.

between $5,000 and $10,000, and 2 received more than $10,000. Agents who purchased stock under the offering had commission income during 1960 ranging from $93.56 to $24,925.26. Of the 29 agents who received over $1,000 in commissions in 1960, 7 purchased stock under the offering.

MGI and GIA stock was not registered on any stock exchange during the times relevant hereto. There were no reported bid and asked prices for the stocks in any Milwaukee newspaper prior to the end of July 1960. The National Monthly Stock Summary, a recognized source of quotations for over-the-counter stocks,[14] lists one bid for MGI and GIA stock for the period between April 1 and October 1, 1960. The bid was made on September 12, 1960, at the issue price of the February 25, 1960, offering.

From March 4, 1960, to the end of July 1960, there were at least 43 sales of MGI and GIA stock.[15] These transactions involved approximately 4,900 shares of MGI and 1,225 shares of GIA.[16] Most of the transactions occurred in Milwaukee. Prior to July 1960, no brokerage firm was materially involved in the transactions. During July 1960, Bache & Co. was the purchaser in a few sales. In over 75 percent of the transactions, the buyer or the seller was Marshall J. Palakow (hereinafter referred to as Palakow). Taking into account the subsequent stock split and merger, the sales price in the transactions ranged from $5.47 per adjusted MGI share in March to $10.87 per adjusted MGI share in July.[17]

In some of the transactions referred to above where Palakow was the buyer or the seller, he was buying or selling for his own account. In other cases he was a middleman, buying or selling for the benefit of someone else. In transactions where Palakow acted as a middleman, the purchasers' checks for the sale price were made out to him. In at least three of these transactions, Palakow paid substantially less for

---

[14] The National Monthly Stock Summary contains a summary of stock market quotations appearing in the National Daily Quotation Service and supplied by dealers on special lists. The National Daily Quotation Service contains bid and asked prices from the principal investment and trading houses throughout the country.

[15] During the same period, MGI issued 82 new stock certificates and GIA issued 80 new stock certificates as a result of transferred stock. The discrepancy between the number of sales and the number of new stock certificates is not clearly accounted for in the record. Several factors might enter into an explanation of the discrepancy. First, the record does not reveal whether all the transfers giving rise to new certificates were sales. Second, there was normally a delay between the date of a sale and the issuance of a new stock certificate to the purchaser. As a result, there was no necessary relationship between the number of sales during the period in question and the number of new certificates issued during the same period. Third, several sales were consummated between one seller and two or more buyers. Such sales caused an imbalance between the number of sales and the number of new stock certificates issued.

[16] This is computed on a presplit and premerger basis.

[17] Karl knew generally about the transactions involving MGI and GIA stock. He also knew that the stock was selling at prices higher than the issue price of the Feb. 25, 1960, offering.

the stock than he collected from the actual purchaser.[18] The spread ranged from approximately $500 to approximately $2,500.

From March through July 1960, Palakow purchased and sold for his own account a number of shares of MGI and GIA stock. He apparently made a net profit on these transactions.[19] Within 2 days, on one occasion, he sold shares for his own account for $20,125 and purchased the same number of shares for his own account for $17,250.

At the time petitioner acquired his MGI and GIA stock, he had no knowledge of the 43 sale transactions described above. Nor had he ever seen a published quotation for the stock of either corporation.

In his Federal income tax return for the taxable year 1960, petitioner did not include any income as a result of his purchase of MGI and GIA stock.

In his statutory notice of deficiency for the taxable year 1960, respondent took the position that petitioner's acquisition of MGI and GIA stock was a compensatory bargain purchase. Respondent asserted that the fair market value of the stock at the date of purchase was $100,004. He increased petitioner's gross income by $77,004, the difference between the asserted fair market value of the stock and the $23,000 that petitioner paid for it.

### OPINION

The issue is whether petitioner received compensation in the form of a bargain purchase of MGI and GIA stock and thereby realized gross income under section 61. The law governing the outcome of the issue was stated in *Commissioner* v. *LoBue*, 351 U.S. 243, 248 (1956), as follows:

It is true that our taxing system has ordinarily treated an arm's length purchase of property even at a bargain price as giving rise to no taxable gain in the year of purchase. * * * But that is not to say that when a transfer which is in reality compensation is given the form of a purchase the Government cannot tax the gain under [sec. 61]. * * *

The law was summarized by this Court in *William H. Husted*, 47 T.C. 664, 673–674 (1967), on appeal (C.A. 2, Sept. 8, 1967), as follows:

Ordinarily, a purchase of property does not result in the realization of income. This principle was applied by the Supreme Court in *Palmer* v. *Commissioner*, 302 U.S. 63 (1937), in which the Court found that the taxpayer was merely a purchaser and, accordingly, his purchase did not result in the receipt of income. Later, however, in *Commissioner* v. *Smith*, 324 U.S. 177 (1945), the Supreme Court made it clear that when stock is sold at a bargain for the purpose of compensating someone, such a purchase does constitute the receipt of income.

---

[18] By "actual purchaser" we mean the party shown as the transferee on the transfer books of the two corporations.

[19] The record is not clear as to the amount of this profit.

Still later in *Commissioner* v. *LoBue*, 351 U.S. 243 (1956), the Court held that a bargain sale of stock to an employee because he is an employee is a compensatory sale. The result of these decisions is to leave us with the question of ascertaining whether * * * [the taxpayer] was merely a fortunate or wise purchaser of stock or whether he was allowed to purchase it at a bargain for the purpose of compensating him.

For years petitioner successfully operated an insurance agency in Illinois. Most of his business consisted of mortgage life insurance. In 1959 his volume of business from this line of insurance began to decline. After studying the decline, he decided it was due to the fact that mortgagors were having difficulty making the relatively large downpayments required by institutional lenders. At about this time, Kallas explained MGI's business to petitioner. Petitioner concluded that he could improve his mortgage life insurance business by becoming the MGI agent in Illinois. Petitioner thereupon actively sought the agency. He twice traveled to Milwaukee to negotiate with Karl. As a result of the negotiations, petitioner obtained substantially the same agency agreement that Kallas had.

After completing his negotiations with Karl, petitioner offered to buy some MGI and GIA stock. Petitioner had learned of the availability of the stock from the February 25, 1960, prospectus which Karl had given him as background material about MGI's business. Petitioner wanted a proprietary stake in MGI because he was going to represent it in Illinois. He also wanted the status of being a shareholder, as well as an agent, when dealing with MGI's home office. Petitioner made a similar purchase of stock in another insurance company, North American, which he also began representing in 1960.

MGI and GIA stock was a speculative if not risky investment in 1960. MGI was a relatively new company. There had been little or no experience of private companies engaged in MGI's line of business. It was very difficult to estimate whether MGI would be successful. Petitioner invested $23,000 in MGI and GIA. This was a modest sum compared to the $282,500 he invested in the stock of North American. As of July 28, 1960, when petitioner paid for his MGI and GIA stock, he was not aware of any public trading in the stock.[20]

There were no conditions attached to petitioner's purchase of MGI and GIA stock. The amount of stock he purchased was in no way tied to or limited by his productivity as an MGI agent. Nor was his purchase dependent upon his remaining an MGI agent.

Taking all the facts and circumstances into account, after having carefully reviewed the evidence,[21] we conclude that petitioner neither

---

[20] The record is silent as to when, after this date, petitioner became aware that the stock was being traded.

[21] Petitioner was a very candid and helpful witness. We have accepted all of his testimony. Moreover, we have accepted much of Karl's testimony.

believed nor reasonably should have believed he was purchasing MGI and GIA stock at less than its fair market value. We accordingly conclude that petitioner acquired the stock in an arm's-length purchase. He was, in other words, merely a fortunate or wise investor. It follows that petitioner's purchase of MGI and GIA stock was not a taxable event. *Commissioner* v. *LoBue, supra; William H. Husted, supra.*

Respondent cites several cases in support of his position with respect to the narrow question discussed above. The case at bar is, however, factually distinguishable from these cases. Respondent also attempts to distinguish a case which supports petitioner's position with respect to the narrow question discussed.[22] This case is, however, very similar to the case at bar. In view of the factual nature of the narrow question discussed we do not think a detailed discussion of any of the cases mentioned by respondent with respect to the question is necessary.

Respondent in part bases his position in the present case upon section 1.61–2(d)(2), Income Tax Regs. During 1960, the taxable year involved herein, the relevant portion of the regulation was as follows:

*Property transferred to employee; insurance premiums paid by employer.* * * * if property is transferred by an employer to an employee for an amount less than its fair market value, regardless of whether the transfer is in the form of a sale or exchange, the difference between the amount paid for the property and the amount of its fair market value at the time of the transfer is compensation and shall be included in the gross income of the employee. * * *

Respondent issued a ruling in 1962 which amplifies this regulation. Rev. Rul. 62–49, 1962–1 C.B. 13. The ruling asserts that the regulation applies to independent contractors, as well as to employees. With respect to independent contractors, however, the ruling limits the applicability of the regulation to bargain purchases which are compensatory. The portion of the ruling which is pertinent hereto is as follows:

When the independent contractor, as a part of his compensation, is permitted to purchase the stock for less than its fair market value, the bargain purchase is governed by the principles of section 1.61–2(d)(2) of the regulations. Although this provision is written in terms of bargain purchases by employees, a compensatory bargain purchase by anyone is governed by similar rules. Accordingly, if the services of an independent contractor are paid for by a transfer of stock or other property for a charge less than fair market value, the difference between the amount paid for the stock or other property and its fair market value on the date of the transfer is includible in the gross income of the independent contractor.

Section 1.61–2(d)(2), Income Tax Regs., was amended in 1963. T.D. 6696, 1963–2 C.B. 24. The amended regulation, insofar as it is here pertinent, is essentially the older version as amplified by Rev. Rul. 62–

---

[22] *James M. Hunley,* T.C. Memo. 1966–66.

49. On brief respondent states that the new version of the regulation does not have retroactive effect to 1960.[23]

In respondent's brief, he takes the position that petitioner is not an employee of MGI, but is an independent contractor. Recognizing that the old version of the regulation does not on its face apply to independent contractors, respondent asks us to give effect to Rev. Rul. 62–49. He argues that under the old version of the regulation, as amplified by Rev. Rul. 62–49, petitioner realized gross income when he purchased his MGI and GIA stock.

We do not agree. Aside from the question whether we should give effect to Rev. Rul. 62–49, we do not think the old version of the regulation, as amplified by the ruling, applies to petitioner. We conclude above that petitioner acquired his MGI and GIA stock in an arm's-length purchase. Translating this conclusion into the terms of the ruling, we do not think there was a transfer of property to petitioner "as part of his compensation." Because one of the conditions of the regulation as amplified by the ruling is not present herein, petitioner's case is not controlled by it.

We hold that petitioner did not realize gross income when he purchased his MGI and GIA stock. Because of this holding, it is not necessary to discuss questions raised by the parties concerning the date petitioner purchased his stock, the value of the stock on that date, and Karl's intention in making the stock available to petitioner.

*Decision will be entered for the petitioners.*

---

[23] We do not pass upon the question whether the new version of the regulation has retroactive effect.

