WILLIAM G. and MARTHA C. MARTIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Martin v. Commissioner
Docket No. 6854-77.
United States Tax Court
T.C. Memo 1979-469; 1979 Tax Ct. Memo LEXIS 61; 39 T.C.M. (CCH) 531; T.C.M. (RIA) 79469; November 26, 1979, filed *61 Petitioner William received interest-free loans from a corporation all of whose stock was owned by trusts established by petitioner for the benefit of his children and of which he was the principal officer and director. Held: Petitioner did not realize taxable income by reason of the interest-free loans to him by the corporation. Dean v. Commissioner,35 T.C. 1083 (1961), and Greenspun v. Commissioner, 72 T.C.     (Aug. 28, 1979), followed. Kirk R. Manning, for the petitioners. Charles L. McReynolds, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent has determined the following deficiencies in income tax for the following years: 1973
$ 3,982.20
1974
15,759.98
After concessions, the only issue remaining for our *62 resolution is: Whether petitioners are in receipt of income during the tax years in issue by virtue of receiving certain interest-free loans, directly and indirectly through petitioners' sole proprietorship, [1] from a corporation of which he was the principal officer. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by reference. Petitioners William G. Martin (Bill Martin) and Martha C. Martin are husband and wife and were residents of Johnson County, Tex., at the time the petition was filed. Petitioners timely filed their joint income tax return for 1973 with the Internal Revenue Service Center at Austin, Tex. Their joint return for 1974 was filed with the Fort Worth office of the District Director of Internal Revenue, Dallas *63 District, on June 16, 1975. Martha is a party to this action by virtue of having filed a joint return with her husband. When we hereinafter refer to petitioner or to Martin, we will be referring only to William. In 1957 Bill Martin founded the original Zuider Zee Restaurant. He eventually expanded his business into a chain of seafood restaurants known as Zuider Zee Restaurants, which restaurants were owned and operated by Zuider Zee Oyster Bar, Inc., a corporation owned by Bill Martin. On December 1, 1961, in order to provide for their children's education and also to minimize their own income tax liability, petitioners established an inter vivos irrevocable trust. The trust assets were to be divided into three separate, equal shares with one trust share to be for the use and benefit of each of petitioners' three children, being Priscilla Kay Martin, Cylinda Sue Martin, and Shauna Dawn Martin. Each trust share was named for the child for whom the trust share was to benefit. The corpus of each trust share consisted of two shares of common stock of Zuider Zee Oyster Bar, Inc., that was transferred by petitioners. Under the terms of the trust agreement, the trust properties, *64 together with the income therefrom of each trust share, could be expended for the benefit of the beneficiary to such extent and in such manner as the trustee in his discretion should determine. To the extent that the trust properties and income therefrom were not expended for the benefit of the beneficiary, such trust properties and any accumulated income therefrom was to be distributed to the beneficiary when she reached 21 years of age, unless the beneficiary extended the terms of the trust. The trustee was authorized to invest and reinvest the trust properties in any kind or character of property including notes. In 1968, Martin and the trust shares exchanged the stock owned in Zuider Zee Oyster Bar, Inc., for letter stock of Ward Foods, a corporation listed on the New York Stock Exchange. The value of the Ward Foods' stock received by the parties was approximately $5 million. In addition to the Ward Foods stock and as partial consideration for the sale, Martin entered into an employment contract to manage the Zuider Zee restaurants for Ward Foods. The contract provided that he would receive a salary of $40,000 per year for the years 1968 through 1973. The contract contained *65 a covenant not to compete and prohibited Martin from entering the seafood restaurant business in competition with Ward Foods for 5 years. In 1970 the Zuider Zee Restaurant chain sold by Martin collapsed. At that time Martin's employment contract with Ward Foods was canceled and the trustee sold all of the trust's Ward Foods' stock. Martin later sued Ward Foods for breach of this contract. A jury, in determining the amount of Martin's damages, found as a fact that the value of his services for the calendar year 1972 was $24,000. On April 8, 1971, Phillip C. Muller (Muller) was appointed third successor trustee of the trust for petitioners' children. Muller is Martin's brother-in-law and is also a close personal friend. Prior to that time Muller had never had business dealings with Martin. At the time of Muller's appointment the fair market value of the assets in each trust share was approximately $26,700. In October 1971 MAR-G Corp. (MAR-G), a Texas corporation, was formed. To capitalize the corporation each trust share contributed $1,900 to the capital of MAR-G, and Muller, as trustee, was issued 100 percent of its outstanding stock. MAR-G was formed to engage in the *66 seafood restaurant business and has from its inception engaged in the seafood restaurant business under the name of Bill Martin's Second Edition Oyster Bar and Seafood Restaurant. In addition to the contribution to capital, the trust shares made loans to MAR-G in the aggregate amount of $53,200. These loans were made between October 10, 1971, and November 23, 1971, and were evidenced by demand notes with interest payable at 9 percent per annum. On March 29, 1972, the trust shares made additional loans in the aggregate amount of $38,582.77. These loans were also payable on demand with 9-percent interest per annum. After the making of these loans, the MAR-G stock and the notes received for the loan were the only assets held by the trust shares. As of the date of trial, MAR-G has paid all principal and accrued interest on the loan made by the Priscilla Kay Martin Trust; as of this same date interest is still accruing on the principal that is owing to the other two trusts. Martin, Martha, and Muller have respectively served as MAR-G's president, vice-president, and secretary, since its inception through 1974. The three of them also constituted the board of directors during *67 this same period.
Martin actively managed on a daily basis all of the affairs of MAR-G's restaurant business and was primarily responsible for the major corporate decisions and policies. For his service to MAR-G Martin received a salary of $25,000 and $23,000 for 1973 and 1974, respectively. MAR-G could have found someone of equal experience and educational background to run its restaurant for the same or less salary. Muller, although an officer and director of MAR-G Corp., did not participate in the management of the affairs of the corporation; he was in essence a passive trustee insofar as the affairs of MAR-G were concerned. It was his belief that Martin would not act as an officer and director of MAR-G in any way which would jeopardize the interests of his children. During the years in issue, Martin also ran at least two other seafood restaurants, Bill Martin's 3d Edition (3d Edition) and Bill Martin's 4th Edition (4th Edition). The 3d Edition was operated as a proprietorship by Martin and the 4th Edition was operated by the Zuider Zee Development Corp. which was wholly owned by Martin. Martin received advances or loans from MAR-G during 1973 and 1974 either in his *68 individual capacity or indirectly through his proprietorship (3d Edition) and through the Zuider Zee Development Corp (4th Edition).The cumulative balances of such loans or advances outstanding at the beginning of each calendar month during the years 1973 and 1974 [2] are as follows: Outstanding Loans To: Month
Bill Martin
3rd Edition
4th Edition
Total
1/1/73
17,340.00
17,340.00
2/1/73
17,340.00
100.00
17,440.00
3/1/73
34,625.00 100.00
34,725.00
4/1/73
34,625.00
2,550.36
37,175.36
5/1/73
37,416.93
63,671.69
101,088.62
6/1/73
7,416.93 114,172.00
116,588.93
7/1/73
2,858.53
13,859.52
133,718.05
8/1/73
3,300.13
125,751.21
129,051.34
9/1/73
3,300 .13
125,751.21
129,051.34
10/1/73
5,520.93
158,810.86
164,331.79
11/1/73
5,741.73
179,027.25
184,768.98
12/1/ 73
11,785.59
202,365.83
214,151.42
1/1/74
12,106.39
193,444.25
205,550.64
2/1/74
12,106.39
193,444.25
205,55 0.64
3/1/74
12,327.19
206,495.87
2,057.97
220,881.03
4/1/74
12,547.99
236,799.94
(667.01)
248,680.92
5/1/74
18,808.79
243,123.00
(9,266.68)
252,665.11
6/1/74
19,280.79
228,654.61
669.95
$248,553.35
7/1/74
19,772.89
235,731.63
18,870.36
274,374.88
8/1/74
20,214.49
232,447.12
28,547.25 281,208.86
9/1/74
20,214.49
232,447.12
28,547.25
281,208.86
10/1/74
25,953.31
243,521.49
35,472.51
304,947.31
11/1/74
26,303.31
229,160.57
23,470.24
278,934.12
12/1/74
35,969.79
240,605.85
5,577.00
281,612.64
*69 None of these loans or advances provided for payment of interest. Martin made these loans to himself or to his corporation by simply writing a check on the MAR-G account at such times and in such amounts as he determined in his sole discretion. The loans were carried on the MAR-G books as open accounts; they were not evidenced by notes nor was any security given. As of the date of trial, none of these loans had been repaid by Martin, but no contention has been made that the loans were not bona fide. The granting of these interest-free loans had been contemplated prior to the inception of MAR-G. Martin and his accountant were concerned that these loans might be viewed as constructive dividends to the trust. Also there was some concern as to whether these interest-free loans might be viewed as wasting the corporation's potential for earning income which might result in exposing the trustee to a suit by Martin's children. In response to these concerns at a special meeting of MAR-G'S BOARD OF DIRECTORS HELD ON November 1, 1971, a resolution was passed, which provided in part: The Chairman stated that from the early planning stages of the Corporation, it was agreed and understood *70 that in exchange for the continuing non-exclusive right to use the name "Bill Martin" in connection with the business operations of the Corporation that Mr. Martin would receive the right to use and have interest free loans from the Corporation to be used by him in connection with his business activities on a completely separate personal basis. It was understood that any loans to him would be made only if as and when the Corporation was able to make such loans and with the clear understanding that the loans would be on a demand basis and payable back to the Corporation immediately upon demand. It was discussed and agreed the the name "Bill Martin" in the State of Texas has a significant secondary meaning is the sea food restaurant business and is a valuable asset to the Corporation. Accordingly, upon motion duly made, seconded and unanimously adopted, the agreement to grant to Bill G. Martin interest free loans for his personal use, insofar as the Corporation was financially able to make such loans, in exchange for the continuing non-exclusive right to use the name "Bill Martin" in the Corporation's business activities and operations, was ratified, confirmed and approved. It *71 was discussed that at this time the Corporation was not in a position to make any loans, but that said loans would be made in the future and recorded on the Book and Records of the Corporation. This determination and action was unanimously adopted. Martin and his accountant believed that this resolution would help protect the trustee from any future litigation in connection with the trusts. Muller, although his signature appears on this resolution, was unaware of its contents and he had no knowledge that these interest free loans were subsequently made. MAR-G did in fact use the name "Bill Martin's Second Edition" in its seafood restaurant business, but there was no other entity using the assumed name "Bill Martin" in Tarrant County, Tex. Insofar as Martin knew, there was no reason that MAR-G could not have filed an assumed name certificate under the name "Bill Martin" and use that name in that business, with or without his approval, except as an officer of the corporation. Although MAR-G would not have paid approximately $9,000 and $27,000 [3] during the calendar years 1973 and 1974, respectively, to someone else who had a name of equal significance and value in the community *72 for the use of such other individual's name, the name "Bill Martin" did have a significant secondary meaning in the area in that it was widely known that Martin was connected with the original Zuider Zee Restaurant, which was a very well known name in the community. In 1975 the trustee, after consulting independent counsel, sold to Martin all of the MAR-G stock for $240,000. By timely mailed statutory notice of deficiency, respondent has proposed to increase Martin's taxable income by $9,566.83 and $27,955.51 for the calendar years 1973 and 1974, respectively. This determination resulted from a finding that petitioner had received an economic benefit from the interest-free use of the funds advanced by MAR-G to Martin, his proprietorship, and his corporation. This benefit was measured by applying the prime rate of interest of a commercial lending institution to the monthly loan balance outstanding from Martin to MAR-G. Respondent concedes on brief that Martin did not realize an economic benefit which is includable in gross *73 income from any interest-free advances made by MAR-G to the Zuider Zee Development Corp.
OPINION During the calendar years 1973 and 1974 MAR-G made interest-free loans to Martin directly and indirectly through his proprietorship and to his wholly owned corporation. The aggregate amounts of interest Martin would have incurred during each of these calendar years if he had obtained loans at the prevailing prime rate of interest from a commercial lending institution in Fort Worth, Tex., in the same amounts as he in fact borrowed from MAR-G are $9,566.83 and $27,85.51, [4] respectively. Respondent contends that Martin received an economic benefit in an amount equivalent to interest he would have had to pay in order to obtain the loans which were advanced, that such benefit was received in consideration for the use of his name or as compensation for services rendered, and that the value of the benefit is includable in gross income pursuant to section 61, I.R.C. 1954. [5] The gist of his argument is that gross income includes all forms of economic benefits from "whatever source derived" unless specifically excluded by the Code. Sec. 1.61-1(a), Income Tax Regs.Commissioner v. Simth, 324 U.S. 177 (1945); *74 Commissioner v. LoBue, 351 U.S. 243 (1956). He further argues that petitioner has failed to show that this economic benefit is statutorily excluded from income. Petitioner makes two arguments in support of his position that no taxable income was realized on receipt of these interest-free loans. First, he argues that these loans were the result of the relationship of the parties and MAR-G's desire to bestow upon Martin a gratuitous benefit since he was the father of the beneficiaries of the trust which owned the corporation. In other words, there was no quid pro quo for MAR-G's making of these interest-free loans since Martin was not obligated to render any consideration in return for the receipt of these loans. Aspegren v. Commissioner, 51 T.C. 945 (1969). Compare Husted v. Commissioner, 47 T.C. 664 (1967). In support of this position he states *75 that the name "Bill Martin" had no substantial value and that even if it did, there was no reason MAR-G could not have used his name without his consent. He further contends that these interest-free loans did not represent additional compensation since it was established by a jury in his litigation with Ward Foods that $24,000 represented an adequate salary during the years in issue. Alternatively, petitioner argues even if MAR-G had an expectation of receiving some new or additional consideration in return for its having made interest-free loans to Martin, as a matter of law the receipt of a noninterest-bearing loan does not result in taxable income to the borrower under our decision in Dean v. Commissioner, 35 T.C. 1083 (1961). On reply brief, for the first time, respondent acknowledges the possible applicability of our decision in Dean to the facts in the instant case and argues that Dean was wrongly decided and should not be followed. Additionally, he argues that petitioner is not a shareholder as in Dean and that, therefore, the facts before use are distinguishable. We have had occasion quite recently to reconsider our conclusion in Dean *76 and reaffirmed it. Greenspun v. Commissioner, 72 T.C.     (Aug. 28, 1979). We see no reason to reconsider it again at this time. See Zager v. Commissioner, 72 T.C.     (Sept. 5, 1979); Creel v. Commissioner, 72 T.C.     (Sept. 25, 1979). [6] We agree with petitioner's alternative argument that Dean controls the resolution of this case. As to respondent's arguments on the nonapplicability of Dean to this case, we considered precisely the same argument in our court-reviewed opinion and decision in Greenspun v. Commissioner, supra.[7] In that case we held that no taxable income was realized by the borrower on receipt of a loan with a favorable rate of interest even when received as a quid pro quo for services to be rendered. In this case we are not convinced that the interest free loans were made as a quid pro quo for services to be rendered by petitioner or for the use of petitioner's name, although we do not have to decide that issue. See Aspegren v. Commissioner, supra.Nor do we believe this case is distinguishable from Dean *77 on the ground that petitioner was an employee of MAR-G but not a stockholder. In both Zager and Creel the taxpayers were both stockholders and employees. And in Greenspun the taxpayer was neither a stockholder nor an employee of the lender. We find the facts in the instant case to be indistinguishable [8] from those in Greenspun, and for the reasons stated in that case, and in Zager and Creel, we continue to follow Dean and hold for petitioner. *78 Decision will be entered for the petitioners. Footnotes
1. During the years in issue, petitioner also received loans indirectly through his wholly owned corporation. For purposes of this case, respondent has conceded that petitioners did not receive an economic benefit which is includable in gross income as a result of loans received indirectly through the wholly owned corporation.↩
2. No evidence was offered regarding whether Martin had followed this practice previous to the years in issue.↩
3. This is the approximate amount of the economic benefit that respondent seeks to include in petitioner's gross income for the taxable years in issue.↩
4. This is the amount stipulated and reflected on Exh. 3-C. However the notice of deficiency increased petitioners' income by $27,955.51. ↩
5. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise stated.↩
6. See also Marsh v. Commissioner↩, 73 T.C.    , (Nov.    , 1979).
7. Greenspun↩ was decided after the briefs were filed in this case.
8. One of the bases for dour decision in Greenspun v. Commissioner, 72 T.C.     (1979), was that if the loan had called for payment at the pre/ailing rate of interest, the payment of the additional interest would have been fully deductible by the taxpayer. In his reply brief here, respondent stated-- petitioner has not shown that, had he been legally obligated to pay interest and interest in fact had been paid, the payments would not have fallen into one of the statutory exceptions or limitations to deductibility. Seee.g., sections 163(d) and 265. While we may be disposed to consider the applicability of Dean where nondeductibility is shown to exist, cf. Greenspun v. Commissioner, supra at    , respondent is too late in raising this issue. Petitioner had no opportunity to offer evidence on this issue, and it would therefore be inappropriate for the Court to consider this argument. Peoples Translation Service v. Commissioner, 72 T.C. 42, 51↩ (1979).