**RUBBER RESEARCH, INC., Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 19748.

United States Court of Appeals, Eighth Circuit.

March 16, 1970.

---

Harry H. Peterson, Minneapolis, Minn., for appellant.

Ann E. Belanger, Atty., Dept. of Justice, Washington, D. C., for appellee; Johnnie M. Walters, Asst. Atty. Gen., and Lee A. Jackson and Jonathan S. Cohen, Attys., Dept. of Justice, Washington, D. C., on the brief.

Before VAN OOSTERHOUT, Chief Judge, and BLACKMUN and HEANEY, Circuit Judges.

BLACKMUN, Circuit Judge.

The Tax Court has upheld the Commissioner's determination of (a) a deficiency of $65,480 in the corporation income tax of Rubber Research, Inc. (hereinafter called Research) for its fiscal year ended March 31, 1962; (b) of a deficiency of $827.59 in Research's income tax for fiscal 1963; and (c) of the imposition of the maximum 25 per cent addition, amounting to $16,370, to the fiscal 1962 tax under § 6651(a) of the Internal Revenue Code of 1954 for failure to file a return. T.C. Memo 1969–24; 28 T.C.M. 118. Judge Tannewald's decision was not reviewed by the full court. Research appeals but, by agreement, does not contest the 1963 deficiency here. Our jurisdiction under § 7482 of the 1954 Code is established.

The basic facts are not in dispute and most of them are established by the pleadings or by stipulations.

Research is a Minnesota corporation organized in November 1960. One of its principal purposes is the development, production, and distribution of rubber products. In May 1961, in exchange for all the authorized shares of its Class B nonvoting capital stock, Research received from Wabash College, St. Louis University, and Brandeis University an exclusive license relating to certain

chemical processes and patents for the treatment of natural and synthetic rubber and, as well, the power to sublicense. The three institutions were themselves assignees of patents theretofore possessed by Fred J. Stark, Sr., the owner of the voting stock of Research.

Rubber Research Elastomerics, Inc. (hereinafter called Elastomerics) is a Minnesota corporation organized in April 1961 with 262,500 authorized shares of $1 par capital stock. During Research's fiscal year 1962, that is, during the year ended March 31, 1962, Research granted Elastomerics an exclusive sublicense (under the license hereinabove described) in return for 136,500 shares of Elastomerics stock and a royalty.[1] It is this simple transaction which has led to the challenged deficiency in Research's fiscal 1962 tax.

Concededly, Research filed no corporation income tax return for fiscal 1962. Concededly, also, Research's adjusted income tax basis for the sublicense it granted Elastomerics was zero.

Research's position here, as we understand it, is (1) that it is the difference between the value of the sublicense granted to Elastomerics, on the one hand, and the value of the Elastomerics stock received in exchange therefor, on the other hand, which is to measure any income tax gain to Research, and (2) that the value of the Elastomerics stock was not its par value of $1 per share. The Commissioner's position is that the fair market value of the Elastomerics shares received by Research was $1 per share or $136,500, that this happened to coincide with par value, and that Research realized a taxable gain of that amount upon its grant of the sublicense.

▇ It is to be noted, initially, that the transaction in question was a taxable one and was not tax-free in the sense that resulting gain or loss was not to be recognized. During the administrative aspect of the case, and initially in the Tax Court, Research had argued that its issuance of the sublicense in return for the Elastomerics stock was tax-free under § 351(a) of the 1954 Code. This argument, however, was abandoned in the Tax Court. It really could not be seriously pursued, for the 80 per cent ownership conditions of §§ 351(a) and 368(c) were not fulfilled. (At the trial Research's counsel stated that "they never did have 80 per cent control".) Thus no § 351 issue remains in the case.

▇ This being so, the Commissioner and the Tax Court were obviously correct in their rulings that the income tax gain to Research is to be measured by the difference between the fair market value of the Elastomerics stock which Research received and the adjusted income tax basis to Research of the sublicense it granted. Inasmuch as that basis was zero, the gain coincides with the fair market value of the stock. Section 1012 provides, with exceptions not pertinent here, "The basis of property shall be the cost of such property * * *." Sections 1011 and 1016 pro-

---

1. The Tax Court specifically found that the date of the exchange was February 5, 1962. Research suggests that the exchange really took place on April 21, 1961, although the supporting documents were not effected until February 5, 1962. The record reveals (1) that at a special meeting of the directors of Research on January 20, 1962, a resolution was adopted authorizing the corporation's president "to make" an offer to subscribe for 136,-500 shares of Elastomerics in return for the grant of an exclusive sublicense; (2) that at a special meeting of the shareholders of Elastomerics on January 29, 1962, a resolution was adopted accepting the offer of Research for the sublicense in return for 136,500 shares of Elastomerics stock; (3) that at a meeting of the directors of Elastomerics on February 3, 1962, Research's offer of the sublicense in return for the shares was accepted and the issuance of the shares was specifically authorized; and (4) that at a special meeting of the directors of Research on February 15, 1962, that corporation formally accepted the shares of Elastomerics "in payment of the sublicense agreement". We regard these several dates as of no individual significance, for the relevant stock sales, hereinafter described, span the period from April 1961 through March 1962 and the sales were consistently at the price of $1 per share.

vide for adjustments to basis, none of which is pertinent here. Section 1001 (a) specifies that the gain from the disposition of property "shall be the excess of the amount realized therefrom over the adjusted basis * * *." Section 1001 (b) provides, "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." And § 1002 states that, except as otherwise provided, "on the sale or exchange of property the entire amount of the gain * * * shall be recognized." These statutes are clear and specific and, at this late date in the life and administration of the income tax laws, their controlling character and their meaning admit of little doubt.

Research's argument appears to be that because it had no cost, or could show none, in the sublicense it granted to Elastomerics, the sublicense is to be valued and that value is to be used in measuring gain or loss, and that because that value and the value of the shares received were the same, there was no gain on the transaction. This is simply not the law and it is not the Code's method of measuring gain on a transaction of this kind. Wessel v. United States, 49 F.2d 137, 139 (8 Cir. 1931). The value of the sublicense, as distinguished from its cost and adjusted basis, was wholly immaterial.

We see nothing at all arbitrary about the statutory scheme or about the Commissioner's application of the statutes which would lead to the invocation and application of cases such as Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935), urged upon us by Research. What the Commissioner has done here, in contradistinction to the situation in the *Taylor* case, 293 U.S. at 514–515, 55 S.Ct. 287, 79 L.Ed. 623, is not arbitrary or irrational but is in accord with the theory and concept of the statutes.

■■ Having thus concluded that the exchange was a taxable transaction and that Research's adjusted income tax basis in the sublicense was zero, then, as we have noted, the fair market value of the 136,500 shares received measures the gain to Research. The Commissioner and the Tax Court found that that stock at the time of the exchange on February 5, 1962, had a fair market value of $1 per share. Valuation of stock for tax purposes is a question of fact. Arc Realty Co. v. Commissioner of Internal Revenue, 295 F.2d 98, 103 (8 Cir. 1961); Hamm v. Commissioner of Internal Revenue, 325 F.2d 934, 938 (8 Cir. 1963), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046; United States v. Righter, 400 F.2d 344, 351 (8 Cir. 1968). This being so, the "clearly erroneous" standard of review, Rule 52(a), Fed.R.Civ.P., has application to the Tax Court's finding. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Idol v. Commissioner of Internal Revenue, 319 F.2d 647, 651 (8 Cir. 1963).

■ A review of the record convinces us that the evidence in the aggregate is supportive of the Tax Court's valuation finding and, indeed, is overwhelmingly so, and that the finding is not clearly erroneous. On December 21, 1961, Elastomerics filed with the Minnesota Commerce Commission an application for the registration of 119,270 shares of its capital stock. The application proposed a sales price of $1 per share. On January 16, 1962, the Commission entered an order registering those shares for sale in Minnesota at $1 per share. From April 8, 1961, until the date of that approval Elastomerics received subscriptions from 17 subscribers for an aggregate of 61,980 shares of its stock at $1 per share.[2] From that ap-

---

2. Subsequent to the Tax Court trial, Research filed an affidavit of Fred J. Stark, Sr., president of both Research and Elastomerics, to the effect that the stipulation submitted to the court was in error when it recited that a 5,000 share subscription by Robert Feltault was paid on April 8, 1961, and that the correct payment date was, instead, April 28, 1961. The 20 day difference is of no significance

proval date until February 17, 1962, 12,900 more Elastomerics shares were sold to seven persons at $1 per share. By March 31, 1962, only 14,222 of the originally authorized 262,500 shares remained unissued; this was about 5 per cent of the total. Further, Elastomerics carried the sublicense on its books at $136,500. Then, too, some 26,250 shares were transferred to Harvey O. Dow in return for services rendered, a fact which is supportive of some value.

We thus have evidence of actual sales of Elastomerics stock at $1 per share shortly before and shortly after the pertinent valuation date. Those sales concerned 24 different subscribers and a total of 74,880 shares.

This court has said that in determining the fair market value of an unlisted stock "actual sales made in reasonable amounts at arm's length, in the normal course of business, within a reasonable time before or after the basic date, are the best criterion of market value." Fitts' Estate v. Commissioner of Internal Revenue, 237 F.2d 729, 731 (8 Cir. 1956). See Elmhurst Cemetery Co. of Joliet v. Commissioner of Internal Revenue, 300 U.S. 37, 39, 57 S.Ct. 324, 81 L.Ed. 491 (1937). There is nothing in the record to indicate that there was ever any sale of Elastomerics stock at a price other than $1 per share. The fact that some of the sales were to acquaintances of an incorporator and the further fact that those shares may have been repurchased later at the same figure do not destroy the supportive character of the sales. Commissioner of Internal Revenue v. Swenson, 56 F.2d 544, 547 (5 Cir. 1932), cert. denied, 287 U.S. 618, 53 S.Ct. 19, 77 L.Ed. 537. The stock, of course, was speculative but that does not deny the validity of the usual evaluation factors.

Research emphasizes that Elastomerics was a new corporation, that [apart from the transaction in question] it sustained a net loss for fiscal 1962; that at the time of the Tax Court hearing it had paid no dividends; that its assets amounted only to about $63,000; and that its auditors were of the opinion that the stock had no value. All these, however, are but other factors in the evaluation process and they fade here in the light of the evidence of actual contemporaneous sales.

Research places primary reliance on Helvering v. Tex-Penn Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755 (1937), and similar cases where stock value was unascertainable. We regard those cases as neither in point nor helpful. The emphasis in *Tex-Penn* is not only on the speculative character of the shares in question but on their being subject to a restrictive agreement preventing their sale. 300 U.S. at 499, 57 S.Ct. 569, 81 L.Ed. 755. See Victorson v. Commissioner of Internal Revenue, 326 F.2d 264, 266–267 (2 Cir. 1964). Here, in contrast, the fair market value of the Elastomerics stock, although that stock was unlisted, speculative, and not widely held, was ascertainable. Certainly, Research has produced nothing to overcome the presumptive correctness of the Commissioner's determination of value.

■■ There remains the question of the appropriateness of the 25 per cent addition to tax for fiscal 1962. If any addition is proper here, the 25 per cent amount is indicated, for the failure to file endured far more than five full months after the due date of the return and the maximum limitation specified by § 6651(a) would apply.

Section 6012(a) (2) of the 1954 Code specifies that every corporation subject to income taxation shall make a return. Treas. Regs. § 1.6012–2(a) (1) is to the same effect and requires the making

---

for the stipulation covers other subscription payments at the $1 per share price on April 17, April 28, and other dates through September 21, 1961. In any event, the stipulation is binding and we are not free to disregard it. United

States v. Righter, supra, 400 F.2d at 351; Farmers Co-operative Elevator Ass'n, Non-Stock of Big Springs, Neb. v. Strand, 382 F.2d 224, 231 (8 Cir. 1967), cert. denied, 389 U.S. 1014, 88 S.Ct. 589, 19 L.Ed.2d 659.

of a return "regardless of whether [the corporation] has taxable income or regardless of the amount of its gross income." The addition under § 6651(a) has been described as mandatory unless, as the statute provides, "it is shown that such failure is due to reasonable cause and not due to willful neglect". 10 Mertens, Law of Federal Income Taxation § 55.21 p. 132 (1964). The burden of showing the existence of reasonable cause and the absence of willful neglect is on the taxpayer. Heman v. Commissioner of Internal Revenue, 283 F.2d 227, 232 (8 Cir. 1960); 10 Mertens, supra, § 55.23 p. 142.

Research did produce evidence that it sought and received the advice of counsel as to various legal implications, including tax aspects, of the February 5, 1962, transaction. But even if we assume that legal advice under certain circumstances may be exculpatory, see Commissioner of Internal Revenue v. American Ass'n of Eng'rs Employment, Inc., 204 F.2d 19, 21 (7 Cir. 1953), Research produced nothing informative as to the range or details of the advice it received or, specifically, as to whether it received advice as to its obligation to file a return for fiscal 1962. In its brief here it asserts only that it "did not file a tax return for the reason that under the circumstances it was of the opinion that no tax was due." This, obviously and on the face of the statute, is not enough. Co-operative Grain & Supply Co. v. Commissioner of Internal Revenue, 407 F.2d 1158, 1165 (8 Cir. 1969); Logan Lumber Co. v. Commissioner of Internal Revenue, 365 F.2d 846, 854 (5 Cir. 1966); Conlorez Corp., 51 T.C. 467, 473–474 (1968).

The addition to tax, therefore, must be sustained.

The tax result of this case, seemingly, is an unfortunate one for Research. We need not speculate, however, whether it could have been avoided. We are compelled to hold on the record that the Commissioner's determinations and the decision of the Tax Court were correct in all respects.

Affirmed.