JOHN CALDERAZZO and WILMA CALDERAZZO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Calderazzo v. Commissioner
Docket Nos. 6315-71, 6316-71.
United States Tax Court
T.C. Memo 1975-1; 1975 Tax Ct. Memo LEXIS 370; 34 T.C.M. (CCH) 1; T.C.M. (RIA) 750001; January 6, 1975, Filed. *370 Held: Petitioner, Wilma Calderazzo, received liquidating distributions in 1966 in the total amount of $ 103,596.17 from two corporations in which she owned all the capital stock. Since she failed to prove her basis in the stock the entire amount of the distributions is taxable as long-term capital gain. Held, further: Wilma Calderazzo is liable for the 25-percent addition to tax under sec. 6651(a) for failure to file an income tax return for 1966. Michael H. Otis, for the petitioners. Kenneth B. Wheeler, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In these consolidated cases respondent made alternative determinations of deficiencies in tax and additions to tax of John Calderazzo (docket No. 6315-71) and Wilma Calderazzo (docket No. 6316-71) for the *371 year 1966 as follows: Additions to tax
Docket
Year
Deficiency
sec.
sec.
No.
6651(a)
6653(a)
6315-71
1966
$ 24,062.24
--
$ 1,203.11
6316-71
1966
23,332.82
$ 5,833.21
--
On brief respondent conceded that John Calderazzo did not receive income from the transactions here involved. [1] Thus the only issues remaining for decision are: (1) Whether Wilma Calderazzo realized long-term capital gain totaling $ 103,596.17 from liquidating distributions received by her in 1966 in the amount of $ 57,500 from Hinsdale Shoe Products Co. (Hinsdale) and in the amount of $ 46,096.17 from Embassy Shoe Corporation (Embassy); and (2) whether Wilma is liable for a 25-percent addition to tax as prescribed in section 6651(a), I.R.C. 1954, for failure to file a Federal income tax return for 1966. Certain of the facts were stipulated and are so found. The stipulation of facts, together with the exhibits attached, are incorporated herein by reference. The only evidence *372 offered, in addition to the stipulation and exhibits received in evidence, was the testimony of John Calerazzo.His testimony was elliptical, confusing, and sometimes contradictory and it has been difficult for us to determine the true nature of the transactions which give rise to this controversy. Related below are facts which reflect our best effort to make such a determination from the evidence presented.
John Calderazzo (John) and Wilma Calerazzo (Wilma) are husband and wife, who, at the time they filed their petitions, resided in Temple Terrace, Fla. John filed separate income tax returns for the calendar years 1966 and 1967, claiming Wilma as a dependent on the 1966 return, with the Southeast Internal Revenue Service Center, Chamblee, Ga. Wilma did not file a return for 1966 but filed a separate income tax return for the year 1967 with the Southeast Internal Revenue Service Center, Chamblee, Ga.
Embassy was incorporated under the laws of the state of New York in 1955. It was dissolved by proclamation of the secretary of state of New York published December 16, 1963, although John was not aware of this fact until shortly before trial in this case in 1974.Wilma owned all *373 of the stock of Embassy throughout its existence. Hinsdale was incorporated under the laws of New York on March 3, 1965, and was dissolved by proclamation of of the secretary of state of New York published December 15, 1969. Wilma owned all the stock of Hinsdale throughout its existence. John and Wilma had been involved in the business of manufacturing and/or selling shoes for a number of years prior to 1965. The business was carried on in various corporate forms with Wilma owning the stock of the corporations and John actually running the businesses. John acted as Wilma's business manager, making business decisions and forming corporations to conduct business with Wilma's funds. He was also responsible for keeping the books and records, opening and closing checking accounts, borrowing money, and making contracts for the businesses, and accounting for their income and expenditures. Embassy was apparently the vehicle used for the conduct of this business in the late 1950's and the early 1960's. During the early 1960's Embassy's business consisted of supplying materials to shoe manufacturers who made shoes for Embassy to sell. During this period John, in behalf of Embassy, *374 contracted for the manufacture of shoes with two brothers who owned a shoe manufacturing plant in Derby, Conn. This plant received materials for the manufacture of shoes from Embassy shipped on Embassy invoices. Apparently sometime in 1963 or 1964 this manufacturing operation in Connecticut went bankrupt. The materials and equipment in the bankrupt's operation became the subject of a bankruptcy court hearing, as a result of which the materials which Embassy had shipped to the contractor and which were still on hand were returned to John as agent for Embassy. In early 1965, John entered into an agreement with Joseph Ciacio under which John was to make the upper part of shoes and Ciacio was to make the bottom part and the shoes were to be sold through a corporation to be formed and owned equally by the two. John formed Hinsdale for this purpose, with Wilma as sole stockholder. Hinsdale borrowed money to obtain materials and equipment for this operation which continued until about November 1965. In late summer of 1965 the Calderazzo business had on hand some summer shoes which John was trying to sell at reduced prices because they were out of season in New York. In November *375 1965, he contacted Frank Garcia of Leeds Shoe Co. in Tampa, Fla., in this connection. Garcia told him Leeds would buy the shoes but only if John would meet him in Tampa the next day to discuss the situation. John went to Tampa and met with Garcia, an accountant named Guida, and others. He was told that this group had obtained a commitment from the Small Business Administration, a local bank, and the Chamber of Commerce of Bushnell, Fla., for $ 504,000 to build a shoe manufacturing plant in Bushnell. John was asked if he was interested in joining in the venture, overseeing the construction of the plant, and operating it after it was completed. John agreed. Under the agreement a new corporation named Rover Shoe Co. (Rover) was formed to conduct the enterprise, and 80,000 of the 180,000 authorized shares of Rover's stock were to be issued to Wilma. The Calderazzos were to supply some capital and materials for making shoes and possibly some machinery. John returned to New York and terminated his agreement with Ciacio in order to devote his time to the Rover venture. Loans that had been made by Ciacio to Hinsdale in the amount of $ 13,000 were paid with materials owned by Embassy *376 or Hinsdale which were stored in Ciacio's place of business. John made arrangements with Louis Goodman, a long-time business acquaintance, to buy shoe manufacturing equipment for Rover, using Hinsdale as a repository and transfer agent. In early 1966 the following events transpired. Materials and equipment were shipped from New York to Rover on Embassy invoices bearing the following dates and amounts: Invoice
Date
Amount
No.
1306
Jan. 27, 1966
$ 49,713.68
1307
Jan. 27, 1966
20,170.00
1308
Jan. 27, 1966
5,712.49
1309
Feb. 17, 1966
9,706,10
1310
Feb. 17, 1966
16,484.92
Total
101,787.19
Invoice No. 1309 was for equipment; the other four invoices were for material. The materials shipped to Rover were principally the materials recovered from the bankruptcy proceeding and partially materials and equipment held by Hinsdale. On March 29, 1966, 44,430 pounds of shoe findings and other materials and/or equipment were shipped from Hinsdale to Rover. On January 31, 1966, the board of directors of Hinsdale authorized the opening of a corporate bank account in the Valley National Bank of Long Island, New York. The following deposits and withdrawals *377 were made on that account on the following dates and from the following sources and to the following payees: $ M03,00,12,00$ G*3*DEPOSITS$ G Date$ JAmount$ JSource$ D$ QFeb. 3, 1966$ Y$ 20,000.00$ BCheck from Rover Shoe Co.$ QFeb. 10,1966$ Y15,000.00$ BCheck from Rover Shoe Co.$ QFeb. 14,1966$ Y15,000.00$ BL. Goodman - personal$ QFeb. 16,1966$ Y8,000.00$ BL. Goodman - personal$ QMar. 1,1966$ Y10,000.00$ BUnknown$ QMar. 24,1966$ Y25,000.00$ BLeeds Shoe Co.$ QMay 6, 1966$ Y264.46$ BUnknown$ QJune 7, 1966$ Y21,794.01$ BUnknown$ QJune 13,1966$ Y485.94$ BUnknown$ QJune 17,1966$ Y6,252.55$ BUnknown$ Q*3*WITHDRAWALS$ Q$ Y$ BPayee$ D$ QFeb. 14, 1966$ Y1,500.00$ BWilma Calderazzo$ QFeb. 16, 1966$ Y16,000.00$ BWilma Calderazzo$ QFeb. 18, 1966$ Y10,000.00$ BWilma Calderazzo$ QFeb. 21, 1966$ Y10,000.00$ BWilma Calderazzo$ QFeb. 24, 1966$ Y20,000.00$ BWilma Calderazzo$ QMar. 3, 1966$ Y400.00$ BJohn Calerazzo$ QMar. 10, 1966$ Y2,000.00$ BLouis Goodman$ QMar. 10, 1966$ Y3,000.00$ QCash - endorsed John Calderazzo$ QMar. 10, 1966$ Y3,000.00$ BLouis Goodman$ QMar. 15, 1966$ Y500.00$ BJohn Calderazzo$ QMar. 15, 1966$ Y555.57$ BEastern Air Lines$ QMar. 24, 1966$ Y5.30$ QMar. 28, 1966$ Y25,000.00$ BLouis *378 Goodman$ QMar. 31, 1966$ Y750.00$ BJohn Calderazzo$ QApr. 18, 1966$ Y200.00$ BCash - endorsed Wilma Calderazzo$ X$ =P Several additional small checks, not relevant here, were written on this account in May. In June four additional checks appear to have been written on this account but the copies of the bank statement and checks attached to the stipulation are almost illegible. One of these checks, dated June 15, in the amount of $ 17,060 appears to have been issued to Louis Goodman; another dated June 24 in the amount of $ 10,000 appears to have been issued to Rover Shoe Co. This account was closed July 1, 1966. On February 13, 1966, the board of directors of Embassy authorized opening a corporate bank account in the Meadow Brook National Bank of Valley Stream, New York. The following deposits and withdrawals were made in that account on the following dates and from the following sources and to the following payees. $ M03,00,12,00$ G*3*DEPOSITS$ G Date$ JAmount$ JSource$ D$ QFeb. 24, 1966$ Y$ 16,484.92$ BRover Shoe Co.$ QMar. 3, 1966$ Y200.00$ BUnknown$ QMar. 7, 1966$ Y9,706.10$ BRover Shoe Co.$ Q*3*WITHDRAWALS$ Q$ Y$ BPayee$ D$ Q$ QMar. 11, 1966$ Y16,500.00$ BAngelo Guida$ *379 QMar. 18, 1966$ Y9,500.00$ BAngelo Guida$ QApr. 21, 1966$ Y317.78$ BTahitian Inn$ X This account was closed in June of 1966. On February 18, 1966, one day after the date on Embassy invoices Nos. 1309 and 1310, John addressed a letter to Rover Shoe Co., attention Angelo Guida, who was one of the organizers of Rover and the individual in the organizing group with whom John dealt, which stated, in part: As I understand you now there should be in the mail a check from Rover to Embassy for $ 16,484.92 which is in full payment for invoice #1310. Embassy invoice #1309 amounting to $ 9,706.10 will be paid by Rover at some later date. Also, I am expecting from you as quickly as possible $ 10,000 more advance payment to Hinsdale Shoe for machinery and equipment. The personal checking account of Wilma Calderazzo in the Valley National Bank of Long Island reflects the following transactions relative to the issues here involved, the source of the deposits being stipulated. $ M03,00,09,00$ G*3*DEPOSITS$ G Date$ JAmount$ JSource$ D$ QFeb. 14, 1966$ Y$ 1,500$ BHinsdale Shoe Co.$ QFeb. 14, 1966$ Y16,000$ BHinsdale Shoe *380 Co.$ QFeb. 17, 1966$ Y10,000$ BHinsdale Shoe Co.$ QFeb. 21, 1966$ Y10,000$ BHinsdale Shoe Co.$ QFeb. 24, 1966$ Y20,000$ BHinsdale Shoe Co.$ Q*3*WITHDRAWALS$ QDate$ YAmount$ BPayee$ D$ Q$ QJan. 29, 1966$ Y$ 5,000.00$ BRover Shoe Co.$ QJan. 31, 1966$ Y7,000.00$ BRover Shoe Co.$ QJan. 31, 1966$ Y8,000.00$ BRover Shoe Co.$ QFeb. 16, 1966$ Y15,000.00$ BAngelo Guida$ QFeb. 18, 1966$ Y14,500.00$ BRover Shoe Co.$ QFeb. 18, 1966$ Y5,203.83$ BRover Shoe Co.$ X
On each of Embassy Shoe Co. invoices to Rover Shoe Co. numbers 1306, 1307, and 1308 there appears the following notation written by John Calderazzo: Paid - 1/27/66. Received payment in full from Wilma Calderazzo. Embassy Shoe Corp. Fernando Ramirez. Pres.Fernando Ramirez was not president of Embassy Shoe Co. on January 27, 1966; he was one of two young brothers who worked for Embassy. On March 22, 1966, Wilma Calderazzo executed an affidavit stating: I, Wilma Calderazzo, do hereby certify that all of the merchandise shipped to Leed's Warehouse for Rover Shoe Co. was personally *381 owned by me and is free and clear of any encumberances, chattels, mortgages and liens. The original of this affidavit was mailed to Guida. The first sentence in the letter dated February 18, 1966, from John to Rover, attention Guida, referred to and quoted from above, read as follows: Enclosed you will find check #1485 in the amount of $ 5203.83 this check being in full for the 80,000 shares of stock certificates in Rover Shoe Co. for Mrs. Wilma Calderazzo. The check referred to was drawn on the personal account of Wilma Calderazzo. In August of 1966, Wilma received 80,000 shares of Rover stock valued at $ 1.26 per share. OPINION In his notice of deficiency issued to Wilma Calderazzo respondent determined that during the taxable year 1966 Wilma received a liquidating distribution in the amount of $ 57,500 from Hinsdale Shoe Products Co., and a liquidating distribution in the amount of $ 46,096.17 from Embassy Shoe Corporation, that she realized a long-term capital gain of $ 103,596.17 from these distributions, and that her taxable income should be increased by $ 51,798.09 as a result thereof. Wilma did not file a return for 1966 *382 and these transactions were not reported on her husband, John's, return for 1966. In her petition Wilma alleged that during the year 1966 Hinsdale and Embassy transferred funds to her in the amounts of $ 57,500 and $ 46,096.17, respectively, but that the funds so transferred were not the property of Wilma and did not inure to her benefit, but were immediately transferred by Wilma to an unrelated third party pursuant to instructions of such third party. Respondent, in his answer, admitted the first part of the allegation, concerning the transfer of funds to Wilma, but denied the remainder of the allegation. The issue arises out of the transfer, ostensibly from Embassy and Hinsdale, two New York companies in which Wilma owned all of the stock, to Rover Shoe Co., a corporation formed in Florida to manufacture shoes, of materials and equipment for the manufacture of shoes, the issuance of 80,000 shares of Rover stock in Wilma's name, and what appears to be a merry-go-round of funds transferred by check from Rover to Hinsdale, from Hinsdale to Wilma, and from Wilma to Rover and Angelo Guida, the principal organizer of Rover; and also from Rover to Embassy and from *383 Embassy to Guida. At trial and on brief petitioner takes the position that the shoe-making materials shipped to Rover were owned by Wilma and that she exchanged these materials plus a small amount of cash for 80,000 shares of stock in Rover. Petitioner claims that the various transfers of checks, set out in our findings of fact, were part of a scheme devised by Guida and others, in behalf of Rover, to indicate that Rover had sufficient private capital to justify a $ 504,000 loan from the Small Business Administration, and that the checks were written by Rover to Hinsdale and then from Hinsdale to Wilma and back to Rover rather than directly back to Rover, to avoid the appearance of a mere exchange of checks or a "kiting" operation. Petitioner also claims that Guida channeled some of the funds into his own name to pay for his share of the stock of Rover. At trial and on brief, respondent takes the position that the materials and machinery shipped to Rover were actually owned by Embassy and Hinsdale, as indicated by the documentary evidence (invoices and checks), that Embassy and Hinsdale sold the materials and equipment to Rover in exchange for cash and shares *384 of stock of Rover, and that Hinsdale thereafter distributed $ 57,500 in cash to Wilma, and Embassy distributed $ 46,096.17 in value of Rover stock or something to Wilma, both as liquidating distributions by those companies to Wilma. No evidence was offered to prove Wilma's basis in either the stock of Hindale and Embassy, or in the materials and machinery, despite questions from the Court regarding same. On brief neither party addressed the question of the tax liability of Wilma in the event the Court concluded that she owned the materials and machinery, with no proven basis therein, and exchanged them for 80,000 shares of Rover stock stipulated to have a value of $ 1.26 per share, or a total of $ 100,800. After analyzing all of the evidence and trying to piece together the jigsaw puzzle of John Calderazzo's testimony, we conclude that as of the beginning of the year 1966 the materials that were shipped to Rover by Hinsdale and Embassy during the first three months of 1966 were owned by Hinsdale and Embassy. We also conclude that the payments received from Rover for these materials, either in the form of cash or as a credit on the purchase price of *385 Rover stock, were distributions to Wilma in liquidation of Hinsdale and Embassy. Since there is no proof that Wilma had any basis in the stock of the two companies, the value of the entire amount received by Wilma consitutes long-term capital gain taxable to Wilma in 1966. [2]
Respondent's determination carries with it a presumption of correctness, Welch v. Helvering, 290 U.S. 111, and petitioner has the burden of proving error therein. Rule 142(a), Rules of Practice and Procedure, U.S. Tax Court. Respondent determined in the notice of deficiency that petitioner received $ 57,500 from Hinsdale and $ 46,096.17 from Embassy as liquidating distributions in 1966. There is no question that Wilma received $ 57,500 in checks from Hinsdale; but there is no evidence that Wilma received any checks or cash from Embassy in 1966. Nevertheless, petitioner admitted in her petition that she did receive $ 46,096.17 from Embassy in 1966 and there is no *386 evidence that she did not receive it. Perhaps respondent's determination and petitioner's admission with respect to this item has reference to the value of Rover stock received by Wilma in exchange for materials transferred to Rover by Embassy. [3] In any event we must start on the premise that she did receive $ 46,096.71 from Embassy in 1966. The next question is whether Wilma received the checks as liquidation distributions from Hinsdale, or simply as a conduit in Guida's scheme to revolve funds through Hinsdale and Wilma and back to Rover. There is room for argument that the latter was the case from the evidence that between February 14 and 24, Wilma received $ 57,500 in checks from Hinsdale and that between January 29 and February 18 Wilma sent checks totaling $ 54,703.83 to Rover and Guida. However, Rover did not send any checks to *387 Hinsdale prior to February 3 and Hinsdale did not give any checks to Wilma before February 14, by which time Wilma had already sent three checks, dated January 29 and 31 and totaling $ 20,000 to Rover. Furthermore, the sequence of the checks is not at all inconsistent with respondent's argument that Hinsdale sold materials to Rover and, upon receipt of payment therefor, distributed these amounts to Wilma as liquidating distributions, which Wilma immediately paid over to Rover for the Rover stock. The ownership of the materials shipped to Rover is a vital question in putting this puzzle together and it is particularly there that Wilma fails to carry her burden of proof. We can give no weight to Wilma's affidavit that she owned the materials. She was in the courtroom throughout the trial but was not called as a witness. When the affidavit was offered in evidence John testified that she would not be called as a witness because she did not know anything about it.Respondent did not press an objection. Except for Wilma's affidavit the only evidence that Wilma owned the materials was John's testimony that she did and the acknowledgments of payments being received from *388 Wilma on three of the invoices from Embassy to Rover mentioned in our findings of fact. But John's own testimony makes it clear that the Calderazzo shoe business had always been conducted in corporate form and that the materials shipped to Rover were a part of materials Embassy had supplied to a shoe manufacturing firm in Connecticut which had gone bankrupt and the materials were returned to John as agent for Embassy by the bankruptcy court.There is no evidence of how ownership of these materials may have passed to Wilma. While Embassy was dissolved by the secretary of state of New York in 1963, this fact was not known to John until shortly before this trial. There was no evidence that Embassy was liquidated prior to 1966; in fact its directors authorized the opening of a bank account in 1966 and a considerable amount of money passed through that account in 1966. The dissolution of a corporation does not necessarily constitute a complete liquidation for purposes of the Federal income tax. Frank T. Shull, 34 T.C. 533;[4]Frank Kell, 31 B.T.A. 220.[5] And under New York law a dissolved corporation may continue to function for the purpose of winding *389 up its affairs and the directors of a dissolved corporation shall not be deemed to be trustees of its assets; title to such assets remains in the corporation until transferred by it in its corporate name. N.Y. Business Corporation Law, sec. 1006(a) (1), (McKinney 1963). We conclude that Embassy retained title to these materials until 1966.
We can give no weight to the acknowledgments of receipt written on the Embassy invoices as evidence of Wilma's ownership of the materials before they were shipped to Rover. The statements written on the invoices by John would indicate that Embassy had sold the materials to Wilma at the time or prior to their shipment to Rover. This is entirely inconsistent with John's testimony that Wilma owned the materials prior to 1966. Furthermore, neither Wilma's bank account nor Embassy's *390 bank account reflect a transfer of the amounts shown on those invoices from Wilma to Embassy. John testified that the handwriting was his but he had no recollection of why it was written. We suspect that John may have realized that if the materials were sold to Rover by Embassy, Wilma would realize a capital gain on a distribution of those funds to her, so this device was used to try to avoid recognition of such gain. The evidence is very meager with respect to what Hinsdale may have shipped to Rover in return for the payments it received from Rover. However, it does reveal that Hinsdale had been formed to engage in the business of manufacturing parts of shoes and that it had received loans from its coadventurer to buy materials for this project. John's testimony indicates that at least a part of what Hinsdale shipped to Rover was machinery. It is reasonable to believe that Hinsdale owned machinery for its manufacturing operation and there is no evidence that Wilma owned any machinery.And the fact remains that Wilma received $ 57,500 in cash or checks from Hinsdale in 1966. We conclude that most of the $ 57,500 in checks received by Wilma from Hinsdale, *391 and the $ 46,096.17 received by Wilma from Embassy in one form or another, was used by Wilma to pay for the Rover stock issued to her.Wilma has failed to prove that respondent was in error in classifying these receipts as distributions in liquidation of Hinsdale and Embassy, resulting in capital gain to Wilma. Since Wilma has not proved her basis in the stock we must accept respondent's determination that it was zero and that the entire amount of the distributions, totaling $ 103,596.17, was taxable as long-term capital gain to Wilma in 1966. The remaining issue is whether Wilma is liable for the 25-percent addition to tax determined by respondent for failure to file an income tax return for 1966. Sec. 6651(a), I.R.C. 1954. [6] Petitioner has the burden of proving the existence of reasonable cause and the absence of willful neglect. Rubber Research, Inc. v. Commissioner, 422 F.2d 1402 (C.A. 8, 1970); Breland v. United States, 323 F.2d 492 (C.A. 5, 1963); William M. Bebb, 36 T.C. 170 (1961).
*392 Wilma did not file a Federal income tax return for 1966. She offered no evidence to show that her failure to file a return was due to reasonable cause and not to willful neglect.We therefore must find that respondent properly determined that she is liable for the addition to tax imposed by section 6651(a) of the Code. Decision will be entered for the respondent in docket No. 6316-71. Decision will be entered under Rule 155 in docket No. 6315-71 Footnotes
1. John conceded another adjustment in his income determined in the notice of deficiency so the decision in his case will have to be entered under Rule 155. ↩
2. We believe substantially the same result would ensue if Wilma owned the materials, with no proven basis therein, and exchanged them for stock in Rover stipulated to have a value of $ 100,800. ↩
3. We do not know where respondent got the $ 46,096.17 figure; but in the guessing game we are obliged to engage in here we surmise that the figure may have been arrived at by subtracting the $ 54,703.83 Wilma paid to Rover in checks from the $ 100,800 stipulated value of the Rover stock issued to Wilma. ↩
4. This case was reversed, 291 F.2d 680 (C.A. 4, 1961), but for reasons that have no application here. Shull was decided under Virginia law which differs somewhat from New York law, and in that case there was a voluntary dissolution while here the dissolution was apparently involuntary. ↩
5. See Henry Yeckes, T.C. Memo. 1966-178↩.
6. Sec. 6651(a). In case of failure - (1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor * * *, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is not for more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate * * *. ↩